715 F.2d 822
 13 Fed. R. Evid. Serv. 1136
 UNITED STATES of America
v.
AIMONE, Gildo, Appellant in No. 82-5290.
UNITED STATES of America
v.
DENTICO, Lawrence, Appellant in Nos. 82-5297 and 82-5511.
UNITED STATES of America
v.
D'AGOSTINO, Dominick, Appellant in Nos. 82-5298 and 82-5512.
UNITED STATES of America
v.
MUSTO, William V., Appellant in No. 82-5304.
UNITED STATES of America
v.
SCARAFILE, Frank, Appellant in No. 82-5305.
UNITED STATES of America
v.
POWERS, John J., Appellant in No. 82-5306.
UNITED STATES of America
v.
GENOVESE, Anthony, Appellant in No. 82-5307.
 Nos. 82-5290, 82-5297, 82-5298, 82-5304 to 82-5307, 82-5511
and 82-5512.
 United States Court of Appeals,
Third Circuit.
 Argued May 11, 1983.
Decided Aug. 25, 1983.
Rehearing and Rehearing In Banc Denied Sept. 19, 1983.
 
 William M. Kunstler (argued), Mark B. Gombiner, Kunstler & Mason, New York City, for appellants Dentico and D'Agostino.
 Theodore V. Wells, Jr. (argued), Judy G. Russell, Lance D. Cassak, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N.J., for appellants Musto, Scarafile and Genovese and Co-counsel for appellant Powers.
 Joseph A. Hayden, Jr. (argued), Shain, Hayden, Perle, Rafanello & Schaffer, Newark, N.J., for appellant Powers.
 Robert A. Baime, Sills, Beck, Cummis, Zuckerman, Radin & Tishman, P.A., Newark, N.J., for appellant Aimone.
 Samuel Rosenthal (argued), Chief, Appeals Division, Asst. U.S. Atty., W. Hunt Dumont, U.S. Atty., Newark, N.J., for appellee.
 Alan Ellis, Philadelphia, Pa., S.A. Guiberson, Houston, Tex., for amicus curiae, National Association of Criminal Defense Lawyers, Inc.
 Before ADAMS and WEIS, Circuit Judges and VanARTSDALEN, District Judge.*
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 Defendants in these consolidated appeals were found guilty of violating the Racketeer Influenced and Corrupt Organizations Act. They contend there was discrimination in the selection of grand jury forepersons and a variance between the conspiracy charged and the evidence at trial. They also challenge the verdict because the trial judge interviewed a juror during deliberations at the suggestion of counsel, and another juror reaffirmed her agreement with the verdict following a recantation shortly after a spectator's emotional outburst in the courtroom. Having considered these and the defendants' other contentions, we find no reversible error and affirm.
 
 
 2
 After a twenty-one week jury trial, the seven defendants who are appellants in this case were convicted of RICO violations, conspiracy, mail fraud, and wire fraud. Four of the defendants were found guilty of income tax fraud as well. The jury also returned verdicts of not guilty on nine of the forty-six counts in the indictment. All of the appellant's post-trial motions were denied.
 
 
 3
 The evidence at trial established to the jury's satisfaction the existence of an enterprise consisting of defendants Lawrence Dentico, Dominick D'Agostino, and Thomas Principe,[1] together with the Orlando Construction Company and Rudolph Orlandini. Dentico and D'Agostino supervised and promoted the affairs of the enterprise through their control of the Orlando Construction Company and other entities formed to develop and manage construction projects in Union City and North Bergen, New Jersey. Defendant Genovese assisted the enterprise in his capacity as an architect for the Orlando Company and the related entities.
 
 
 4
 The other defendants were all public officials. Defendant William Musto was the mayor of Union City and a state senator. Frank Scarafile was the deputy chief of police in Union City and a member of the Board of Education. John Powers was the president of the Union City Board of Education. Gildo Aimone was executive director of the Union City Housing Authority, and John Bertoli[2] held a similar position in North Bergen. These public officials accepted bribes to use their offices and influence in furtherance of the enterprise's affairs. Through their assistance, the enterprise received city construction contracts, tax abatements, and payments on fraudulent work orders. The city officials also cooperated with the enterprise in its attempt to have Union City purchase an office building at a grossly inflated price.
 
 
 5
 In 1974, the Orlando Limited Partnership, one of the related entities, began development of the Bella Vista senior citizen housing project in Union City. The enterprise agreed to a $50,000 bribe and actually paid $12,000 to Scarafile so that Musto would arrange for a tax abatement and intercede with the state housing authority. Bribes were also paid to obtain similar treatment for other projects undertaken by the enterprise's related entities.
 
 
 6
 A $40,000 bribe was paid to Musto, Scarafile and Powers when the Orlando Construction Company was awarded contracts to renovate two Union City high schools in 1977. For these projects, Musto instructed the school board attorney to "bend the law a little" because some items were missing on an Orlando Company bid.
 
 
 7
 In addition, Aimone allowed the company to file a performance bond after the time originally set and arranged to have all payroll records for the project directed to him. Genovese submitted change orders for work not specified in the contracts and checks were then issued by Aimone. Aimone and Powers also authorized payments for work that was never performed and in some instances double payments were made.
 
 
 8
 Between 1974 and 1978, the enterprise group participated in a number of other public projects, for which bribes were paid to Musto, Scarafile and Powers. Perhaps because of the size of the bribes, the enterprise was financially unable to complete some of the work. To secure additional funds, Dentico directed Orlandini to invest $300,000 in an office building. The plan was that $200,000 would then be paid to Musto, Scarafile and Powers to arrange a purchase of the building by Union City at the inflated price of $3.1 million. Public opposition to the sale, however, caused the purchase price and bribe to be reduced. Although Scarafile received a $75,000 "advance" on the bribe, the sale of the building never took place because of an adverse vote in a referendum. After the election, Orlandini, D'Agostino, Powers and Scarafile agreed that $50,000 of the advance would be returned.
 
 
 9
 In July 1980, Orlandini agreed to cooperate with the government and surreptitiously tape-recorded a number of conversations with defendants as he tried to recover the $50,000. At the trial, Orlandini spent twenty-six days on the witness stand and was extensively cross-examined by defense counsel. The government also introduced the tape recordings made by Orlandini, as well as a significant amount of documentary evidence, including fraudulent change orders, checks, and correspondence among defendants. Five defendants took the stand and presented testimony that lasted more than fourteen days. An expert on linguistics also testified for the defense in support of the defendants' theory that Orlandini had orchestrated the taped conversations so that neutral responses would appear inculpatory.
 
 
 10
 On appeal, defendants raise a variety of issues. Only three merit discussion: the selection of grand jury forepersons, the evidence of a single conspiracy, and the actions of the trial court during jury deliberations and announcement of the verdict. The defendants' other contentions are listed in the appendix.
 
 
 11
 * In the district court, defendants challenged the process for selecting grand and petit jurors and grand jury forepersons as being discriminatory on a variety of grounds, including race, nationality and sex. On appeal, defendants have reduced their contentions to one--the indictment should be dismissed because women were not properly represented as grand jury forepersons in the District of New Jersey.
 
 
 12
 In addressing this contention, the district court accepted the defendants' allegation that a proportionate number of women had not been appointed as forepersons over a five-year period.[3] The court concluded, however, that defendants had not established a violation because the foreperson "does not have disproportionate influence in the deliberative process," and therefore the position is constitutionally insignificant. United States v. Musto, 540 F.Supp. 346, 362 (D.N.J.1982).
 
 
 13
 Fed.R.Crim.P. 6(c) provides that the court shall appoint one of the impaneled grand jurors to act as foreman and one as deputy foreman to act in his absence. The foreman administers oaths, keeps a record of the number of jurors concurring in the finding of an indictment, and signs all indictments. It has been held, however, that the absence of the foreman's endorsement is only a technical irregularity and not fatal to the indictment. Frisbie v. United States, 157 U.S. 160, 163-65, 15 S.Ct. 586, 587-88, 39 L.Ed. 657 (1895).
 
 
 14
 The district court concluded that these duties are "purely ministerial" and that defendants failed to show that a foreperson "has the power to alter the 'unique qualities and characters of the jury's individual members.' " 540 F.Supp. at 362 (citation omitted). The court also observed that each grand jury was selected by a process providing for fair representation of the community.
 
 
 15
 The Supreme Court has not decided whether grand jury forepersons have such a significant impact on the criminal justice system that discrimination in their selection amounts to a constitutional violation. In Rose v. Mitchell, 443 U.S. 545, 551-52 n. 4, 99 S.Ct. 2993, 2998 n. 4, 61 L.Ed.2d 739 (1979), the Court "assume[d] without deciding that discrimination with regard to the selection of only the foreman" requires that a conviction be set aside. It found, however, that discrimination had not been established.
 
 
 16
 Rose was a state conviction case. Under Tennessee law, the trial court chose a foreman from the general population to serve as the thirteenth juror in a body otherwise composed of persons selected by a random process. A foreman served for two years and could be, and often was, reappointed. He was expected to assist the district attorney in investigating crimes, could conduct the questioning of witnesses, and had to sign an indictment for it to be valid. See id. at 548 n. 2, 99 S.Ct. at 2996 n. 2. It is clear that the Tennessee grand jury foreman was in a position to guide the decision-making process of the grand jury and had substantially greater power than his federal counterpart.
 
 
 17
 In Rose the Supreme Court assumed only for purposes of that case that the Tennessee foreman had a significant role. In Guice v. Fortenberry, 661 F.2d 496 (5th Cir.1981), the Court of Appeals for the Fifth Circuit found, however, that a Louisiana state foreman with less power did occupy a controlling position, and in United States v. Cross, 708 F.2d 631 (11th Cir.1983) the Court of Appeals for the Eleventh Circuit reached the same conclusion with respect to federal grand jury forepersons in the Middle District of Georgia, see also United States v. Perez-Hernandez, 672 F.2d 1380 (11th Cir.1982).
 
 
 18
 A contrary view on the role of the federal foreperson was expressed in United States v. Hobby, 702 F.2d 466, 470-71 (4th Cir.1983) and United States v. Coletta, 682 F.2d 820, 822-24 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983). See also United States v. Holman, 680 F.2d 1340, 1356 n. 12 (11th Cir.1982); United States v. Perez-Hernandez, 672 F.2d at 1388-89 (Morgan, J., concurring). In Hobby, the court noted the substantial differences between grand jury forepersons in Tennessee and the federal system, and concluded that the federal foreperson's "role is so little different from that of any other grand juror that the rights of the defendants are adequately protected by assurance that the composition of the grand jury as a whole cannot be the product of discriminatory selection." 702 F.2d at 471.
 
 
 19
 We find that the district court here made a realistic assessment of the role of the federal grand jury foreperson. In our view, the duties of the federal foreperson are only ministerial. We acknowledge the contrary conclusion in United States v. Cross, but point out that forepersons in the Middle District of Georgia were found to perform certain functions not exercised by forepersons in the District of New Jersey. Compare Cross, at 638, with United States v. Musto, 540 F.Supp. at 359. The differences may be attributable to custom and practice that have developed in the respective districts. In any event, we are not persuaded that the duties performed by a federal foreperson confer the power to control the decision-making process of the grand jury.
 
 
 20
 Moreover, we regard it as extremely significant that the Tennessee foreman considered in Rose v. Mitchell was selected from the public at large, whereas the federal foreperson is chosen from among a randomly selected grand jury, and cannot agree with the conclusion in Cross that "this difference is irrelevant." Cross, at 638.[4] We conclude that the selection of one member of a properly constituted grand jury to carry out the ministerial duties of foreperson does not, in the context of this case, raise constitutional concerns. Accordingly, we find no error in the district court's denial of the motion to dismiss the indictment.
 
 II
 
 21
 With respect to the RICO convictions, defendants contend the government drafted an indictment that lumped together six unrelated conspiracies. They allege the prosecution sought to confuse the jury by producing massive evidence of diverse and distinct schemes. Part of the problem, they assert, is that the indictment's description of the "enterprise" as "a group of individuals and a corporation associated in fact" does not conform to the statutory definition, 18 U.S.C. § 1961(4) (1976).[5] They emphasize the statute describes two different types of enterprises--the first being certain designated legal entities; the second "any union or group of individuals associated in fact, although not a legal entity." According to defendants, an enterprise must be in one category or the other, not a combination of both.
 
 
 22
 This argument is not persuasive. It was rejected in analogous circumstances by the Court of Appeals for the Fifth Circuit in United States v. Thevis, 665 F.2d 616, 625-26 (5th Cir.), cert. denied sub nom., Evans v. United States, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). There, the enterprise was described as "a group of individuals associated in fact with various corporations." The court reasoned that Congress used the word "includes" in the enterprise definition to indicate a non-exhaustive listing of associations and that a broad interpretation was intended. Similar reasoning was applied in United States v. Huber, 603 F.2d 387, 393-94 (2d Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758 (1980), where the court recognized that an enterprise could include more than one corporation.
 
 
 23
 We see no indication that Congress intended to restrict the definition of "enterprise" to a number of entities or individuals that all fall within the same category. The Supreme Court has stated that "[t]here is no restriction upon the associations embraced by the definition" in section 1961(4). United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1980). Accordingly, we are convinced that a proper statutory enterprise was charged and proved here.
 
 
 24
 Defendants also argue that the evidence showed more than one conspiracy and thus there was a variance from the indictment. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Camiel, 689 F.2d 31 (3d Cir.1982). After the present case was tried, this court decided United States v. Riccobene, 709 F.2d 214 (3d Cir.1983), where the same issue was raised. There, we agreed with the Court of Appeals for the Fifth Circuit that " 'a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single 'enterprise' conspiracy.' " Id. at 224-25 (quoting United States v. Sutherland, 656 F.2d 1181, 1192 (5th Cir.1981), cert. denied 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982)). The " 'key element is proof that the various crimes were performed in order to assist the enterprise's involvement in corrupt endeavors.' " United States v. Riccobene, 709 F.2d at 224 (quoting Blakey and Goldstock, " 'On the Waterfront': RICO and Labor Racketeering," 17 Am.Crim.L.Rev. 341, 361 (1980)).
 
 
 25
 In the present case, the enterprise undertook construction projects for the enrichment of its members. To promote the projects, defendants committed bribery as well as mail and wire fraud in securing tax abatements, building contracts, public financing, and fraudulent work payments. There was, then, adequate evidence for the jury to find that each of the defendants agreed to conduct, or participate in the conduct of, the enterprise's activities through the commission of predicate offenses. The fact that the jury acquitted on some counts establishes its ability to analyze the conflicting testimony and sort out that which was relevant to specific charges. As the record supports a finding of a single enterprise conspiracy, there was no variance between the indictment and proof at trial.III
 
 
 26
 The points pressed most strongly by defendants grow out of incidents that occurred during the jury deliberations and polling after the verdict was announced.
 
 
 27
 * On the morning of the third day of deliberations, the trial court received a message that Juror No. 9 was upset and crying. She had never been away from her husband in many years of marriage and was distressed at the separation imposed by the sequestered deliberations. After court and counsel discussed the matter, it was agreed, without objection by any of the defense lawyers, that the judge would speak to the juror, alone and off the record.
 
 
 28
 After the meeting, the judge conferred with counsel and gave them a synopsis of his conversation with the juror. The judge reported that the juror was "hysterical because of the pressure of the deliberations. Apparently the foreperson had insisted that the jurors support their views and indicated that they should do so before going to dinner last night. Apparently that direction upset her very much."
 
 
 29
 After some comments from the attorneys, the judge stated that he was looking to them for guidance. A number of alternatives were suggested, but ultimately all of the defense lawyers agreed that the juror should not be excused. With the consent of all defense counsel, the judge spoke a second time with the juror, again without the presence of a court reporter.
 
 
 30
 After that discussion, the judge reported to counsel that he had told the juror that he would "have a chat with [the foreman] as to his functions." The judge also read to Juror No. 9 a portion of the charge he would consider giving to the jury as a whole. In response, the juror said she did not wish to continue under any circumstances.
 
 
 31
 Defense counsel were unable to agree on what should be done at that point, and the court adjourned for a luncheon recess. Upon returning, counsel were informed by the judge that he had met once again with the juror and told her it might be necessary for her to continue serving in the case. The judge said, "She indicated to me that she would be willing to do so."
 
 
 32
 Counsel praised the judge for his ingenuity in bringing the matter to a head and then proceeded to debate the alternatives. Several of the defense lawyers moved for mistrial, others wished to have the juror remain, and another requested a hearing. None wanted to substitute an alternate juror or to proceed with eleven jurors.
 
 
 33
 Counsel then agreed upon language to be used in a supplemental charge to the jury, and a brief voir dire of Juror No. 9 was held in chambers in the presence of counsel and on the record. At that time, the juror responded that she would continue and be impartial. The jury was then called in, given the supplemental instruction on the role of the foreperson in deliberations, and directed to continue deliberating.
 
 
 34
 Even though defense counsel had agreed during the trial that the judge could talk to the juror informally and off the record, they filed post-trial motions arguing that they had not authorized the third conference and that it should have been recorded. The district judge rejected this contention, commenting that counsel for one of the defendants "applauded the court for its 'ingenuity' " and three others joined in another defense lawyer's remark that he " 'adopt[ed] and support[ed] the procedure involved.' " United States v. Musto, 540 F.Supp. 318, 334 (D.N.J.1982). Indeed, none of the defendant's trial counsel objected to the court's third meeting with the juror upon learning of it.
 
 
 35
 The district court found that United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), was not controlling. By contrast, counsel in the present case had promptly received a report of what had transpired at each meeting with Juror No. 9, and a voir dire examination of the juror had been conducted in the presence of all counsel. In addition, the court observed that the supplementary instructions to the entire jury had prevented any misapprehension that might have been conveyed by her to the other jurors. On appeal, defendants nevertheless rely on Gypsum in arguing that they had a right to a complete record of each meeting, rather than the judge's summaries.
 
 
 36
 In Gypsum, the Supreme Court commented that a private meeting between a trial judge and a juror was undesirable, but standing alone was not error. The error in that case arose when the ex parte discussion between the trial judge and the jury foreman drifted into what the Supreme Court construed as a supplemental instruction on the jury's obligation to return a verdict. In addition, since counsel were not aware that the foreman might have been given the impression that a verdict had to be returned in any event, there was no opportunity to seek correction of that misapprehension.
 
 
 37
 We agree with the district court that there are substantial distinctions between this case and Gypsum. Here, there was a supplemental charge to the jury in open court that avoided the possibility of an instruction being transmitted by one member of the jury to the others. Counsel also had the opportunity to be present at the voir dire of the juror with whom the court met. Nor can we overlook the fact that counsel were eager to have the trial judge meet with the juror to determine the extent of the problem. Indeed, the defense lawyers were enthusiastic in their approval of the trial judge's action; only the prosecution voiced any reservations.
 
 
 38
 The Gypsum case emphasizes the dangers of ex parte communications with jurors and nothing we say here should be construed as encouraging such communications. Nevertheless, when defense lawyers, as a matter of trial strategy, urge the judge to conduct off-the-record interviews with a juror in a situation like this, we hold counsel to their obligations to the court. They may not promote action by a trial judge and then assign that compliance as error. "Sandbagging" will not be countenanced by this court. See United States v. Pecora, 693 F.2d 421, 425 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3087, 77 L.Ed.2d --- (1983). Nor is our position altered by the fact that different counsel are chosen to represent the parties on appeal. Trial counsel's actions in this respect are binding on the client and appellate counsel as well. See United States v. Provenzano, 620 F.2d 985, 997 (3d Cir.1980), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1981) (noting "longstanding rule that counsel's intentional tactical decisions at trial bind his client.").
 
 
 39
 Moreover, there is not the slightest indication in this record that the interview with Juror No. 9 in any way influenced the verdict. The conversations between the judge and juror focused on the juror's reluctance to continue and the conduct of the deliberations by the foreman. The juror's willingness to remain was established by the voir dire. The foreman's role in the deliberative process was covered fully in the supplemental instructions given by the trial judge before the jury resumed its deliberations after disposition of Juror No. 9's complaint. These instructions were carefully and exhaustively reviewed with counsel and in final form were approved by all defense lawyers.
 
 
 40
 We reject as well the defendants' contention that there should be a post-trial interrogation of the jurors about what they may have been told by Juror No. 9. In these circumstances, that would constitute an unwarranted intrusion into the jury deliberations. See Fed.R.Evid. 606(b) ("a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations"); Sullivan v. Fogg, 613 F.2d 465 (2d Cir.1980); King v. United States, 576 F.2d 432 (2d Cir.), cert. denied, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); United States v. Eagle, 539 F.2d 1166 (8th Cir.1976), cert. denied, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977); Government of Virgin Islands v. Gereau, 523 F.2d 140 (3d Cir.1975), cert. denied, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). In sum, we find no reversible error in the trial court's disposition of the issues with respect to Juror No. 9.B
 
 
 41
 Two days after the incident with Juror No. 9, at about 6:30 p.m., the jury asked for clarification of the evidence on one of the counts. Following consultation with counsel, the court responded to the inquiry. Shortly afterward, the jury sent word that it had reached a verdict.
 
 
 42
 As the foreman announced the verdict of guilty on the first count in the crowded courtroom, there was "a tremendous outpouring of emotion," as the trial judge phrased it. "Mrs. Musto, the wife of one of the defendants, rose to her feet and broke into tears. As the foreman continued to read the verdict, she clutched at her husband ... and continued to weep. Several of the female jurors, observing Mrs. Musto's reaction to the verdict, then began to cry themselves.... Several relatives attempted to remove Mrs. Musto from the courtroom but she reacted by tightening her embrace of her husband and by continuing to cry hysterically." 540 F.Supp. at 328.
 
 
 43
 When announcement of the verdicts on all counts had been concluded, defense counsel requested a poll. The court informed the jurors that each of them would be asked if he or she agreed with the verdict and that they should answer "yes" or "no." The first three jurors answered "yes," but Juror No. 4 said "no."
 
 
 44
 The district court's opinion describes the ensuing scene: "At this point, pandemonium broke out in the courtroom. Many supporters of the defendants who were present leapt to their feet screaming. People pounded on the benches of the courtroom and some of the defense attorneys pounded on their desks and shouted." Id. at 329. The trial judge then directed the jurors to resume deliberations. As the jury walked toward the exit, Juror No. 4 turned to the trial judge and said, "Your Honor." He held up his hand to stop her from saying more, and the jury left the courtroom.
 
 
 45
 The judge then met with counsel in chambers and detailed Juror No. 4's actions on the record, saying, "She obviously wishes to communicate with the court in some way. I look to [counsel] for assistance." A spirited discussion followed for several minutes. The judge then asked counsel to review a note he proposed sending to the jury, asking whether Juror No. 4 wished to speak to the court or whether the jury wished to continue deliberations. Just as counsel reached agreement on the phrasing of the note, the court received one from the jury that read: "May we continue polling the jury?" The judge estimated that no more than 10 or 15 minutes had elapsed since the jury had left the courtroom.
 
 
 46
 One of the defense lawyers requested the judge to inquire in open court whether Juror No. 4 wished to see him. The judge refused and announced that the jury would be polled, beginning with Juror No. 1. Defense counsel objected to this sequence, contending that the polling should begin with Juror No. 5.
 
 
 47
 Before beginning the second poll, the judge cleared the courtroom of all persons other than defendants, counsel and members of the press. He then reminded the jurors that each would be asked if he or she agreed or disagreed with "the verdict as announced by your foreperson." On the poll, each juror answered "yes."
 
 
 48
 After the polling was completed, the jury returned to the deliberation room while counsel presented motions. One of the defense lawyers said that Juror No. 4, "although she answered 'yes,' put her hands in the air and shrugged and was crying and shook her head and said 'yes' in a tone of resignation which I really did not have the impression represented her free will." Other counsel asked that the judge interview Juror No. 4 in the presence of counsel, but the court declined.
 
 
 49
 In his opinion, the trial judge referred to Juror No. 4's vote and said: "The poll did not reveal the juror's uncertainty with the verdict. Although Juror No. 4 made certain gesticulations at the time she indicated her agreement with the verdict, the court cannot conclude that those gestures indicated uncertainty with the decision." 540 F.Supp. at 342.
 
 
 50
 When the jury was recalled to the courtroom to be discharged, one defense attorney asked for another poll, this one as to each count. The trial court refused and dismissed the jury.
 
 
 51
 Defendants argue on this appeal that, after Juror No. 4 answered "no", a mistrial should have been granted or, in any event, further instructions should have been given at that point. They also contend that the second poll should not have begun with Juror No. 1, and that a valid verdict was not recorded. Defendants are critical as well of the trial judge's failure to meet with Juror No. 4 before accepting the verdict and his refusal to interview her after the verdict was received. Finally, they assign error in the district court's refusal of a poll on each count.
 
 
 52
 The trial judge acted properly in requiring the jury to deliberate further after the aborted first poll. Fed.R.Crim.P. 31(d) provides that if there is not unanimous concurrence on a poll, "the jury may be directed to retire for further deliberation or may be discharged." The choice is a matter within the discretion of the trial judge, even if a motion for mistrial is made. United States v. Warren, 594 F.2d 1046, 1049 (5th Cir.1979). The trial judge is in a better position than an appellate court to determine the likelihood of an ultimate unanimous verdict after a dissenting vote during a poll. His judgment, particularly after a lengthy trial such as this one, must be given proper deference. See United States v. Smith, 562 F.2d 619, 622 (10th Cir.1977).
 
 
 53
 Defendants did not request additional instructions before the jury left after the first poll, and in view of the emotionally charged atmosphere in the courtroom, the trial judge properly removed the jury from the scene as quickly as possible. Any other course of action would have risked further disruption of the trial in its concluding moments and possibly tainted the verdict.
 
 
 54
 We also find no error in the trial judge's decision not to speak with Juror No. 4 once he learned that the jury wished to resume polling. An interview at that stage would have been intrusive and might well have interfered with the jury's function. Moreover, the second polling offered Juror No. 4 an opportunity to continue to dissent, if she so chose. By clearing the courtroom of spectators, the judge provided a much calmer ambience for the second poll.
 
 
 55
 We noted earlier that interviews with individual jurors are not to be encouraged, and that is particularly so in the circumstances present here. The trial judge's prudence was proper. As we observed in United States v. Lee, 532 F.2d 911 (3d Cir.), cert. denied, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976), making inquiries of jurors threatens the secrecy of deliberations and invites charges of coercion and interference with the jury's function. See also United States v. Nelson, 692 F.2d 83, 85 (9th Cir.1982); United States v. Sexton, 456 F.2d 961, 966 (5th Cir.1972).
 
 
 56
 Defendants next argue that Juror No. 4's gestures indicated that she did not assent to the verdict. The trial judge, however, wrote that "the court cannot conclude that these gestures indicated uncertainty with the decision." 540 F.Supp. at 342. We must rely upon the trial judge's appraisal of the circumstances.[6] It is particularly appropriate that we do so in this case where the trial was marked by the judge's scrupulous sense of fairness, his determination to observe the defendants' rights, and his continuing courtesy to counsel in difficult and exhausting circumstances.
 
 
 57
 We also reject the defendants' contention of error in beginning the second poll with Juror No. 1. The method of polling is entrusted to the discretion of the trial court. See United States v. Shepherd, 576 F.2d 719, 722 n. 1 (7th Cir.), cert. denied, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978). There has been no demonstration of a misuse of that discretion here. Moreover, we have held it to be error for a trial judge to inquire into the numerical division of the jury when informed that a jury has been unable to reach a decision. Government of Virgin Islands v. Romain, 600 F.2d 435 (3d Cir.1979); see Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926). Had the trial judge continued the first poll after Juror No. 4 dissented, the numerical division of the jury would have been revealed. Once a juror has dissented from the verdict, there is no need for further polling and to continue the process without the opportunity for further deliberation is erroneous. See United States v. Spitz, 696 F.2d 916 (11th Cir.1983) (per se error to continue polling).
 
 
 58
 The repolling in this instance obviously had to begin with Juror No. 1. A poll that omitted Juror No. 4 and left her dissent as a position of record would have impermissibly revealed the numerical division of the jury. The trial judge properly began the process anew.
 
 
 59
 We find no merit as well in the defendants' argument that the trial court erred in refusing their request for a poll on each count after the verdict was recorded. As we observed before, the manner in which a poll is conducted is within the discretion of the trial court. Moreover, "the power to repoll is also among the judge's discretionary powers." United States v. Morris, 612 F.2d 483, 489 (10th Cir.1979). Defendants have shown no abuse of discretion here. See United States v. Lustig, 555 F.2d 737 (9th Cir.1977), cert. denied, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978).
 
 
 60
 We also reject the defendant's contention that the district court should have held a post-verdict hearing on what Juror No. 4 wished to communicate to the court as she left the courtroom after the initial poll. As noted earlier, post-verdict inquiries of jurors are strongly disfavored and severely restricted. "This is to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain." King v. United States, 576 F.2d 432, 438 (2d Cir.1978). Defendants have not produced any grounds adequate to justify deviation in this case from the settled policy.
 
 
 61
 Finally, the defendants argue that because the jury's findings were not reannounced before the second polling began, there is no valid verdict. No objection to this effect was made at the trial, and it is too late now to raise such a technical point. If defendants had a genuine concern about the problem, then they should have presented it to the trial judge when correction could easily have been accomplished. In any event, we are confident that the jurors knew precisely what they were doing when the trial judge began the second poll by directing their attention to the verdict that had previously been announced.
 
 
 62
 Accordingly, the judgments of the district court will be affirmed in all respects.
 
 APPENDIX
 
 63
 Listing contentions raised and rejected but not discussed in opinion.
 
 A. Contentions of all defendants:
 
 64
 1. The district court erred in limiting the testimony of an expert witness to a general discussion on the linguistic analysis of conversations and in not allowing him to apply that analysis to the specific tape recorded conversations introduced in this case.
 
 
 65
 2. The district court erred in permitting the jury to use transcripts of tape recordings during deliberations.
 
 
 66
 3. Reversal is required on the basis of cumulative error.
 
 
 67
 4. The law and facts of the case were too complex for the jury to render individualized and rational decisions.
 
 
 68
 B. Contentions raised by defendants Dentico and D'Agostino and joined in by defendant Aimone:1. The district court abused its discretion in failing to sever any of the defendants or counts.
 
 
 69
 2. The district court erred in its handling of a post-trial hearing on, and in refusing to set aside the verdict on the basis of, an alleged social relationship between one of the jurors and the government's main witness.
 
 
 
 *
 The Honorable Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Principe is a fugitive and has not been tried
 
 
 [2]
 Bertoli was found guilty by the jury, but was granted a new trial
 
 
 [3]
 The district court found that of the 25 forepersons and 25 deputy forepersons selected between April 1976 and July 1981, two forepersons and three deputy forepersons were female. A prima facie statistical case was held to have been established because the percentage of women chosen was sufficiently disparate from the district's 52% female population. United States v. Musto, 540 F.Supp. 346, 357-59 (D.N.J.1982). The government contends that the statistical analysis is flawed because the sample and the time period were both too small, and because the geographic area surveyed was the Newark vicinage rather than the entire district of New Jersey. In light of our resolution on this issue, we express no view on the statistical aspects of the district court's opinion
 
 
 [4]
 The court in Cross found that the Tennessee foreman "probably does not have the potential for influence on the grand jury's deliberations" because "[h]e does not participate in the grand jury voting process." Cross, at 638. That finding was based on a reference in Rose, in connection with one of the parties arguments there, to "the nonvoting foreman of the grand jury." 443 U.S. at 560, 99 S.Ct. at 3002. In summarizing Tennessee law on grand juries, however, the Supreme Court stated that "[t]welve members of the grand jury must concur in order to return an indictment ... [and] [t]he foreman or forewoman may be 1 of the 12." Id. at 548 n. 2, 99 S.Ct. at 2996 n. 2 (citations omitted)
 
 
 [5]
 Section 1961(4) provides:
 " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."
 
 
 [6]
 It is unfortunate that we must rely only on the recollections of some of those who witnessed the occurrences at the end of this case. With the advent of videotape, modern technology has made it possible to have speedy, inexpensive visual and audio recording of trials. As early as 1930, Judge Jerome Frank said that sound motion pictures should be made of trials. See United States v. Rubenstein, 151 F.2d 915, 921 n. 5 (2d Cir.1945) (Frank, J. dissenting). See also J. Frank, COURTS ON TRIAL 224 (Princeton Univ. Press 1945). Yet today when vastly improved methods are available, the courts must still depend on the techniques that were used a hundred years ago. See United States ex rel. Perry v. Mulligan, 544 F.2d 674, 679 n. 3 (3d Cir.1976)