**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**ROMAL COLBOURNE, Defendant**

Criminal No. 185/1994

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

July 27,1995

JOHN W. DAVIS III, ESQ., Assistant Attorney General, (Department of Justice), St. Thomas, V.I., *for plaintiff*

AUGUSTIN AYALA, ESQ., Territorial Public Defender, St. Thomas, V.I., *for defendant*

HODGE, *Presiding Judge*

## OPINION

This matter is before the court on the defendant's original and supplemental Motions for a New Trial or for Dismissal, which are opposed by the Government. The questions presented are (1) whether the Government committed any *Brady* or *Jencks* violations warranting a new trial; (2) whether the response of Juror No. 5 during the polling of the jury required the court to discharge the jury or order further deliberation; and (3) whether there is newly discovered evidence warranting a new trial.[1] For the reasons cited herein, the defendant's motion will be denied.

### I.

The defendant was formally charged on June 15, 1994 with Murder in the First Degree in violation of 14 V.I.C. §§ 921 and 922(a)(1) [Count I]; and Unauthorized Possession of a Firearm During the Commission of a Crime of Violence in violation of 14 V.I.C. § 2253(a) [Count II]. At his Arraignment on June 16, 1994, the defendant appeared and pleaded "Not Guilty" to the charges. He demanded a jury trial which began on November 30, 1994. After deliberation, the jury found the defendant "Guilty" of both counts. On January 13, 1995, the defendant was sentenced to life in prison without parole for Count I, Murder in the First Degree; and sentenced to pay a fine of $5,000.00 and to serve seven years in prison for Count II, Unauthorized Possession of a Firearm During the Commission of a Crime of Violence. Both jail terms are to be served concurrently.

On December 7, 1994, defense counsel filed a Motion for a New Trial. Subsequently, on March 24, 1995 the defendant filed, *pro se*, a supplemental Motion for a New Trial or Dismissal based on lack of jurisdiction and newly discovered evidence. This memorandum addresses both motions.

The defendant asserts in his Motion for a New Trial that on June 21, 1994, he submitted a written request to the Government for

---

[1] The defendant also contends that this court lacks subject matter jurisdiction over this case based on the date of the incident. However, this issue was previously raised by the defendant in a pre-trial motion to dismiss, which was denied in a Memorandum Opinion dated November 25, 1994.

"the names and addresses of all persons with knowledge of the facts pertaining to the shooting or who were interviewed by the Police or Government agents in connection with the shooting, and for specific *Brady* material." He states that the Government failed to produce the statements of two material witnesses, Danny Guzman and Brian Bourjeois. Claiming that the statements of Guzman and Bourjeois were favorable to him, the defendant argues that he was unable to properly impeach the witnesses during cross examination, therefore he was denied his Fifth Amendment right to due process of law as guaranteed by *Brady v. Maryland*, 373 U.S. 83 (1963). The defendant also argues that the Government's payment of $200.00 to one of its key witnesses, Eronimo Williams, requires a new trial. He argues that the payment is suggestive of impropriety, and that the fact of the payment is *Brady* material.

The defendant further argues that Juror No. 5's response during the polling of the jury was inadequate and required the court to discharge the jury or send it back to deliberate. He contends that the fact that Juror No. 5 nodded her head instead of giving a verbal response shows that her testimony was coerced and that she did not agree with the verdict.

Finally, the defendant argues that after he was convicted and sentenced, he discovered two fellow prisoners of witness Danny Guzman who claim that Guzman told them that he did not see the defendant shoot the victim, but that he intended to lie at the trial to get a reduced sentence.[2]

In response to the defendant's arguments, the Government contends that the defendant was given a fair trial, and that the jury's decision was based on the clear and unequivocal testimony of eyewitnesses who saw the defendant shoot and kill the victim. The Government argues that it is under no duty to release witness lists and/or statements before trial, pursuant to the Jencks Act, 18 U.S.C. § 3500, and that it did produce the written statements of Guzman and Bourjeois after their direct examination at trial. The Government further argues that the witnesses' statements are not

---

[2] The affidavits of the two prisoners, Kelley Mala and Lakram Ramdat, were submitted with the motion.

Brady material, and even assuming they are, the defendant had ample opportunity to use them effectively during and after cross examination.

The Government also argues that the defendant was notified of the $200.00 payment to Eronimo Williams before the trial, that the check was given to Williams through the Victim Advocate Program in connection with the death of his daughter, that a copy of the check was sent to defense counsel, and that the payment is totally unrelated to Williams' testimony as a witness in this case. Finally, the Government argues that the defendant has failed to show that the statements of the two prisoners are truly "newly discovered," since he could have obtained them two months prior to the trial date.

## II.

### A. Brady Material and Jencks Statements

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Rule 16 of the Federal Rules of Criminal Procedure only requires the Government to disclose specific information to the defense before trial.[3] *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988). This limitation on discovery to the items specified in Rule 16 preserves "an important function of the Jencks Act,[4] the protection of potential government witnesses from threats of harm or other intimidation before the witnesses testify at

---

[3] Such information includes prior statements of the defendant; the defendant's prior criminal record; documents, photographs and tangible objects which are within the custody or control of the government and which are material to the defense or intended for use by the government as evidence in chief at trial or which were obtained from or belong to the defendant; results or reports of physical or mental examinations and of scientific tests or experiments which are material to the defense or intended for use by the government as evidence in chief at trial; and a summary of the testimony of any expert witness the government intends to use. FED. R. CRIM. P. 16(a)(1)(A)-(E).

[4] The Jencks Act is codified at 18 U.S.C. § 3500, but its substance is contained in Rule 26.2 of the Federal Rules of Criminal Procedure. Rule 26.2(a) provides: "After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the government or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified."

trial." *Id.* at 1285. Indeed, Rule 16(a)(2) expressly prohibits the "discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in [the Jencks Act]."

The *Brady* rule is based on the requirements of due process and does not modify the discovery limitations outlined above. Brady requires the Government to disclose evidence favorable to the defendant that, if suppressed, would deprive him of a fair trial. *United States v. Bagley*, 473 U.S. 667 (1985). The elements of a *Brady* violation are that (1) the prosecution suppressed or withheld evidence, (2) which was favorable, and (3) material to the defense. *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991). "Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* at 973.

"[T]he remedy for a *Brady* violation is a new trial and ... [it] is available ... only after a defendant shows that there is a reasonable probability that had the *Brady* evidence been disclosed in time for use at trial, the first trial would not have resulted in a conviction." *United States v. Presser*, 844 F.2d 1275, 1286 (6th Cir. 1988). The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial is insufficient. *United States v. Bagley*, 473 U.S. 667 (1985).

### 1. Statements of Guzman and Bourjeois

The defendant argues that the statements of Guzman and Bourjeois were favorable to him and material to the issue of guilt because they pointed to someone else as the possible perpetrator of the act. He further argues that if he had the statements prior to trial, he could have conducted further investigations so as to better cross examine both witnesses.

■ Guzman gave three statements to the Government, dated May 28, 1994, May 31, 1994 and November 7, 1994. The court finds nothing in any of the three statements that is favorable to the defendant. In the statement, dated May 28, 1994, Guzman said that he did not see who shot the victim, Samuel Clarke, but that the people who were at the scene said the defendant and "Demos" did it. Although Guzman said he did not see the defendant shoot the

148

victim, he did not say that he saw someone else do the shooting. In fact, he said that while he personally did not see the shooting, the people on the scene said it was the defendant. Since this statement is not favorable to the defendant, it is not Brady material and the Government was not required to produce it before the trial. The same holds true for the May 31, 1994 and November 7, 1994 statements in which Guzman said that he saw the defendant shoot the victim. Indeed, these statements incriminate, not exculpate the defendant.

Bourjeois gave two statements to the Government, dated April 18, 1994 and April 21, 1994. There is also a sworn transcript, dated May 6, 1993. Bourjeois was questioned by a prosecutor and an assistant public defender while detained at the House of Detention in St. Maarten, and the transcript of the proceeding was sworn to before a judge in St. Maarten. In the statements dated April 18 and 21, 1994, Bourjeois states that he saw the defendant take a chrome-colored gun from his waist and shoot the victim. In the sworn transcript, Bourjeois states that he did not see who fired the shots, and suggested that it could not have been the defendant because at the time of the shooting the defendant was talking to "Marva" on a porch in the area where he was gambling.

■ Once again, the court finds that there is no *Brady* violation requiring a new trial. The defendant had full access to the May 6, 1993 transcript since it was the basis for dismissal of similar charges filed against him in the District Court. Thus, the transcript was neither suppressed nor withheld by the Government, and is therefore not *Brady* material. Likewise, the subsequent statements of April 18, and 21, 1994 are not *Brady* material because they are neither favorable nor exculpatory to the defendant, even though they contradict the transcript.

■ Furthermore, the defendant only has a remedy for a *Brady* violation if he was deprived of a fair trial, and he has failed to show that had he received the statements prior to trial, it would have affected the outcome of the trial. *United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir. 1988). Here, defense counsel knew of the contradictory statements in the transcript and used them not only for impeachment, but also in his opening and closing statements.

In addition, besides Guzman and Bourjeois, other witnesses appeared in court and testified as to the defendant's guilt. Thus, it is unlikely that the jury would have reached a different verdict if the defendant had obtained the statements earlier, since the jurors could have based their verdict on the testimony of witnesses other than Guzman and Bourjeois.

## 2. Victim Advocate's Payment to Government Witness

The defendant argues that detective Reynold Frazer's delivery, just days before trial, of a $200.00 check from the Victim Advocate Program to Eronimo Williams, a material Government witness, is so prejudicial that a new trial is warranted. The defendant contends that the Government was required to notify the defense of Frazer's delivery of the $200.00 check to Williams because the fact of the delivery is Brady material since it is impeachment evidence. In opposition, the Government states that defense counsel was notified of the payment to Williams prior to the trial, and a copy of the check was given to defense counsel.

Impeachment evidence is *Brady* material only if the "evidence [is] favorable to an accused ... so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 105 S. Ct. 3375, 3380 (1985). At trial, when defense counsel attempted to impeach Williams during cross examination by implying that he was paid to testify, Williams explained that he received the check from the Victim Advocate Program in connection with the death of his daughter, which had nothing to do with this case or his testimony, and that Lynn Falkenthal of the Victim Advocate Program only gave the check to Detective Frazer to deliver to him on their behalf. Thus, despite defense counsel's accusatory cross examination of Williams in connection with the check, the jury apparently believed and accepted Williams' explanation. The defendant's argument is therefore without merit.

## B. Polling of Jury

When the jury retired for deliberation, it was given separate verdict forms for Count I, First-Degree Murder; and Count II, Unauthorized Possession of a Firearm During the Commission of

150

a Crime of Violence. The jurors were advised to select the appropriate forms depending on whether they found the defendant guilty or not guilty. They were specifically instructed that differences of opinion may arise and that they were free to disagree with each other. During deliberation, no provocative questions were asked of the court, and the deliberation was not lengthy. Each juror signed his or her name to each of two verdict forms, one finding the defendant guilty of Murder in the First Degree, and the other finding the defendant guilty of Unauthorized Possession of a Firearm During the Commission of a Crime of Violence.

After the jury's verdict of guilty to both counts was read by the court, the signed verdict forms were delivered to each party for examination of signatures and review of the verdict. Upon inquiry by the court, each party stated that there was no defect in the verdict forms. Nevertheless, defense counsel moved for the jury to be polled. The court granted the motion and each juror was asked by the court: "Is this your verdict?" All jurors responded in the affirmative, with eleven jurors verbally responding "Yes," and Juror No. 5 nodding her head vigorously. The record indicates that at this point, the following exchanges occurred between the court and Juror No. 5:

| THE COURT: | Miss Mary Blyden, is this your verdict? |
| JUROR BLYDEN: | (No response.) |
| THE COURT: | I didn't hear the answer. Did you give an answer? Is this your verdict? |
| JUROR BLYDEN: | (Nods.) |
| THE COURT: | You're nodding your head, but we need to get an answer for the record. |
| JUROR BLYDEN: | (Nods.) |
| THE COURT: | That's a yes? |
| JUROR BLYDEN: | Yes. (Nods.) |
| THE COURT: | All right. Let the record show she nodded her head up and down. |

The defendant contends that the nodding of the head by Juror No. 5 was "non-responsive to the question asked and clearly showed that her testimony was coerced by some other juror or jurors." The defendant argues that the court should have dis-

charged the jury or sent it back to deliberate. The defendant cites *Government v. Hercules*, 875 F.2d 414 (3d Cir. 1989), in which the court stated:

> The object of a jury poll is 'to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been recorded and that *no juror has been coerced or induced to agree to a verdict to which he has not fully assented.' Id.* at 418.

In *Hercules*, the defendant was convicted in the District Court of the Virgin Islands of robbery, grand and petit larceny, assault, and carrying or using a dangerous weapon. The jury was given separate verdict forms for each count, and each juror signed the verdict forms finding Hercules guilty. After the jury announced the verdict, defense counsel requested that the jury be polled, pursuant to FED. R. CRIM. P. 31(d).[5] The trial court denied the request, but invited defense counsel to examine the signatures on the verdict forms. Defense counsel argued on appeal that the court must reverse Hercules' conviction because the signed verdict forms do not constitute a legally acceptable form of polling. Defense counsel also argued that a jury cannot be said to have reached a valid verdict until the result is announced in open court and no dissent is registered by any juror.

The Third Circuit Court of Appeals agreed with defense counsel. It held that mere reliance on verdict forms signed in the jury room is inadequate, and that the jurors must be given an opportunity in open court to express their agreement or disagreement with the verdict. The Third Circuit further held that violation of FED. R. CRIM. P. 31(d) is *per se* error, requiring reversal of conviction.

■ *Hercules* is clearly different from the present case. In this case, defense counsel requested that the jury be polled and the court

---

[5] Rule 31(d) provides:
> When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

granted defendant's request, unlike in *Hercules*, where the court denied the defendant's request. The transcript reveals that when Juror No. 5 nodded her head, she meant "yes." After Juror No. 5 nodded her head twice, the court asked her whether her nodding meant "yes" and she verbally responded "yes" and nodded again. The unequivocal nodding, done with vigor and a smile, indicated to the court no hesitancy or non-responsiveness, especially since there was no indication of doubt, no shrugging of the shoulders, no shaking of the head to suggest a "no" answer, and no question as to her signature on the "Guilty" verdict form. Thus, Juror No. 5 satisfactorily declared her assent to the verdict which she had personally signed, attesting that she was not coerced or induced to agree to the verdict. Indeed, in this case, the verdict forms, signed by each juror, was given to both parties for examination of the signatures and for questions, and both parties responded that they had no questions.

The manner in which a jury poll is conducted is within the discretion of the trial court. *United States v. Mangieri*, 694 F.2d 1270, 1282 (D.C. Cir. 1982). ("The trial court has substantial discretion to decide how the jury should be polled."); *United States v. Aimone*, 715 F.2d 822 (3d Cir. 1983) (Where juror, although she answered "yes," put her hands in the air and shrugged and was crying and shook her head and said "yes" in a tone of resignation, trial court's determination that gestures did not indicate juror's uncertainty with the verdict was not an abuse of discretion). *See also, United States v. Carter*, 772 F.2d 66 (4th Cir. 1985) in which the court held that the trial judge's polling of the jurors by asking for show of hands was not an abuse of discretion, even though the court did indicate that in the future each juror should be asked to respond individually.

In the present case, each juror was polled individually. All jurors responded affirmatively that it was their verdict, even though Juror No. 5 nodded her head instead of orally saying "yes." As the transcript shows, upon further questioning by the court, she verbalized that by nodding her head, she meant "yes." The court then instructed the court reporter to indicate for the record that Juror No. 5 responded "yes," after seeing no uncertainty in her response. Indeed, the court is satisfied that the response of Juror

153

No. 5 to the poll was an unequivocal "yes" for the verdicts of guilty. Thus, there was no valid reason to discharge the jury or send it back to deliberate.

## C. Newly Discovered Evidence

■ Rule 33 of the Federal Rules of Criminal Procedure provides in relevant part that "the court on motion of a defendant may grant a new trial to him if required in the interest of justice." However, when a new trial is requested based on newly discovered evidence, there are generally five requirements that must be met before a trial court may order a new trial. The requirements as established in *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976), are as follows:

(a) the evidence must in fact be newly discovered, i.e., discovered since trial;
(b) facts must be alleged from which the court may infer diligence on the part of the movant;
(c) the evidence relied on must not be merely cumulative or impeaching;
(d) the evidence must be material to the issues involved; and
(e) the newly discovered evidence must be of such a nature, that on a new trial, it would probably produce an acquittal.

Based on the five requirements enunciated above, the defendant's contention that he deserves a new trial based on newly discovered evidence must fail.

The defendant knew prior to trial that Guzman might testify, and it was incumbent upon him to conduct the necessary investigation so that he could effectively cross examine Guzman at trial. The affidavits of the two prisoners produced by the defendant show that they were incarcerated with Guzman at the Metropolitan Detention Center in Guynabo, Puerto Rico at the time Guzman allegedly made the statements. Defense counsel knew that the defendant was incarcerated at the Metropolitan Detention Center and, with due diligence, could have obtained the statements prior to trial. Indeed, since the affiants state that they overheard Guzman's statements two months prior to the trial, routine inter-

view of prisoners with whom Guzman was in close contact could have led to the discovery of the statements long before trial.

Under these circumstances, (1) the evidence is not newly discovered, (2) No due diligence can be inferred, (3) the evidence is only of an impeaching nature, and only as to Guzman, and (4) on a new trial, the evidence would not produce an acquittal. Even if Guzman's testimony were to be stricken completely from the record, ample evidence would remain from which a jury could find the defendant guilty of both counts. Thus, the defendant's contentions based on newly discovered evidence must be rejected.

### III.

Based on the foregoing, the court concludes that the Government was not required to disclose the statements of Guzman and Bourjeois where the statements did not meet the Brady test of being material and exculpatory. And even assuming the statements did meet the *Brady* test, the *Brady* doctrine only requires disclosure in time for effective use at trial, and the defendant was able to use the statements effectively at trial. Secondly, each juror had an opportunity to declare in open court his or her assent to the verdicts, and Juror No. 5 manifested her assent by verbalizing "yes" in response to the court's query of whether she meant "yes" when she nodded her head. The court is satisfied that a unanimous verdict was reached and that Juror No. 5 was not coerced or induced to agree to the verdicts, but instead freely assented to the guilty verdicts. Finally, the defendant failed to satisfy the requirements for the court to order a new trial based on newly discovered evidence. Accordingly, the defendant's Motions for a New Trial or for Dismissal will be denied.

### ORDER

This matter having come before the court on the defendant's original and supplemental Motions for a New Trial or for Dismissal; and

Having considered the submissions of the parties; and

For the reasons set forth in the court's Opinion of this date;

It is hereby,

155

ORDERED, that the defendant's Motion for a New Trial and his Motion for a New Trial or Dismissal based on lack of jurisdiction and newly discovered evidence are DENIED.