UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert FELDMAN,
Defendant–Appellant.

No. 86–5090.

United States Court of Appeals,
Ninth Circuit.

Argued Jan. 6, 1988.

Submitted July 22, 1988.

Decided July 22, 1988.

As Amended Oct. 19, 1988.

Richard D. Burda, Los Angeles, Cal., for defendant-appellant.

Richard M. Callahan, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before TANG, BOOCHEVER and NORRIS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Robert Feldman (Feldman) appeals his conviction for mail fraud, interstate transportation of funds obtained by fraud, use of a false name in furtherance of a scheme to defraud, and conducting an enterprise through a pattern of racketeering. Feldman's most substantial claims are that the district court erred in failing to give the jury a specific unanimity instruction, that the evidence of mail fraud was insufficient, that there was no proof of a RICO enterprise separate from the defendant, and that the forfeiture procedure used at trial was unconstitutional. We affirm his conviction, but remand to the district court for a determination whether Feldman is entitled to an evidentiary hearing on forfeiture.

## BACKGROUND

Feldman's conviction arises out of evidence of his business dealings over a period of more than ten years. Three of Feldman's businesses in Massachusetts and a business in California suffered fires caused by arson, which resulted in Feldman's recovery of substantial insurance proceeds. In connection with his California business, he sent out financial statements to potential lenders listing sales that could not be verified. Through a complex series of financial and real estate maneuvers, occasionally using false names, Feldman concealed the insurance proceeds from the Cal-

ifornia fire from his creditors. The details of his activities are set out in the Appendix to this opinion.

A grand jury returned a superseding indictment charging Feldman with fourteen counts of mail fraud under 18 U.S.C. § 1341 (1982), one count of interstate transportation of funds obtained by fraud under 18 U.S.C. § 2314 (1982), two counts of using a fictitious name in furtherance of a scheme to defraud under 18 U.S.C. § 1342 (1982), and one charge of conducting a criminal enterprise through a pattern of criminal racketeering, under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and 1963 (1982).

The government dismissed Counts 10 and 11 of the superseding indictment (both mail fraud counts). The jury convicted Feldman on all remaining counts.

After the verdict, the court, without allowing further argument or evidence, instructed the jury on RICO forfeiture, and the jury returned a special verdict of forfeiture of $1,986,990. The court then ordered that Feldman not alienate assets as to defeat the forfeiture.

Feldman was sentenced on March 13, 1986, to concurrent terms of ten years on Counts 15 (interstate transportation of funds obtained by fraud) and 18 (RICO). The court placed Feldman on five years' probation on the remaining mail fraud counts, with the condition that Feldman make restitution to his victims in the amount of $1,986,990, the amount of the judgment of forfeiture. On the same day, the district court denied an earlier motion to dismiss the RICO count.

## ANALYSIS

### 1. SPECIFIC UNANIMITY INSTRUCTION

Feldman contends that the proof presented at trial regarding the mail fraud scheme could be interpreted by a rational jury as either a single scheme to defraud or as multiple schemes. He claims that as a result the court should have instructed the jury that "each of the jurors must find the defendant guilty of participation in the same single scheme to defraud *and* that the scheme to defraud in which the defendant is found to have participated is the same scheme as the overall fraudulent scheme alleged in the indictment," quoting *United States v. Mastelotto*, 717 F.2d 1238, 1247 (9th Cir.1983) (emphasis in original).

Feldman's counsel did not object to the mail fraud instruction given at trial; in fact, he stipulated to the instruction as given. The court's failure to give a unanimity instruction therefore requires reversal only if it constitutes plain error, a highly prejudicial error affecting substantial rights. *United States v. Payseno*, 782 F.2d 832, 834 (9th Cir.1986).

The indictment charged Feldman with fourteen counts of mail fraud, all connected to his activities related to Grow Gear, a California corporation. The counts were described in the indictment as "The Looting of Grow Gear Assets," "The Arson Destruction of Grow Gear," and "The Fraudulent Transfers of Cash and Property" intended to hide the insurance proceeds from creditors. None of the Massachusetts activities was alleged as part of the scheme. The indictment describes the scheme to defraud in ten long paragraphs and then sets out the twelve mail fraud counts submitted to the jury. The alleged mailings consisted of falsified financial statements sent to Grow Gear lenders (1 and 2); insurance settlement checks (3, 6, and 8); claims for partial payment (4 and 5); a proof of loss of earnings (7); grant deeds for real property (9 and 14); and reconveyances of trust deeds (12 and 13).

Feldman admits that there was no fatal variance between the indictment and the proof at trial, because a rational jury could have found that the fraudulent transactions alleged in the indictment were all part of a single scheme. Because a rational jury also could have found more than one scheme, we must decide whether (1) the jury was properly instructed that it had to agree unanimously on a single scheme, and (2) if the instructions given were improper, they constituted plain error. *Cf. Mastelotto*, 717 F.2d at 1246 (where defendant does

object to instructions at trial, improper instructions require reversal unless harmless error).

A specific instruction on unanimity is required "where it appears that a conviction might rest upon different jurors having found the existence of different facts ... where the complex nature of the evidence, a discrepancy between the evidence and the indictment, or some other particular factor creates a genuine possibility of juror confusion." *United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986). Otherwise a general instruction on unanimity will suffice. *Id.*

■■■ Feldman's claim that the evidence was complex and that confusion resulted is not particularly persuasive. Although his real estate transactions to conceal the insurance proceeds were complicated, they had to be convoluted to avoid his creditors. The complexity therefore would not necessarily lead a jury to consider the existence of multiple schemes. The underlying purpose seems clear throughout, although Feldman's methods required the use of aliases and straw corporations. *See Mastelotto,* 717 F.2d at 1245 (factors for finding single conspiracy are limited in their usefulness because "the scope of a scheme to defraud is ultimately restricted ... only by the ingenuity of its participants"). He does not support his claim of resulting confusion with any action by the jury, such as requesting clarification of the instruction. *See United States v. Echeverry,* 698 F.2d 375, 376–77 (9th Cir.) (per curiam) (specific unanimity instruction on conspiracy required where jury indicated confusion by submitting question to judge during deliberations, and judge admitted ambiguity), *modified,* 719 F.2d 974 (1983). On the eighth day of trial the jury retired, and deliberated for three days on sixteen counts. How much of that time was spent on the twelve mail fraud counts is impossible to determine, and this court is not free to hypothesize about whether there was disagreement between jurors during deliberation about the existence of a single scheme. *See id.* at 377.

As discussed above, no discrepancy between the evidence and the indictment presents itself. Nor can we isolate another particular factor creating a genuine possibility of jury confusion. *Frazin,* 780 F.2d at 1468. Evidence supports the existence of a single scheme to defraud. The scheme focused on Grow Gear, with the intent of looting it, burning it, and keeping the insurance proceeds from creditors. Feldman was the single perpetrator, with Grow Gear and his creditors as victims. The time involved, 1977 through 1983, is not so long as to make a single scheme unlikely. Finally, California was the location of almost all of the transactions. *See Mastelotto,* 717 F.2d at 1245 (factors for finding a unitary fraudulent scheme).

The judge gave the following instruction:

The indictment in this case alleges a number of false and fraudulent pretenses, representations and promises. It is not essential that the government prove each and every false pretense, representation, promise, or act alleged in order to find the defendant guilty of a violation of the mail fraud statute. Rather, the government must prove beyond a reasonable doubt that one or more or a sufficient number of the false and fraudulent promises, representations, acts and pretenses alleged in the indictment were made to establish the existence of *the scheme to defraud* charged in the indictment.

(Emphasis added). The judge repeatedly referred to "the" single scheme, rather than using ambiguous language such as "some" or "any" scheme. He also reminded the jury: "Keep in mind you must unanimously agree on the verdict. That is, the verdict on each count must be unanimous," and "Your verdict, whether it be guilty or not guilty, must be unanimous."

This court has reversed convictions where jury instructions not only failed to require unanimity but also stated that it was permissible to find the defendant guilty if the mailings were in furtherance of *some* scheme to defraud (*Mastelotto*); where the jury indicated confusion (*Echeverry*); and where the evidence connecting

the defendant to three acts of extortion was complicated and confusing, due to multiple participants and varying methods (*Payseno*). No similar circumstances exist here. Because the evidence was not unduly complex or confusing, and because the judge repeatedly reminded the jury of the general requirement of unanimity, the failure to give a specific unanimity instruction did not result in plain error.

## 2. SUFFICIENT EVIDENCE OF MAIL FRAUD

Feldman claims that the evidence of mail fraud was insufficient to support his conviction.

There is sufficient evidence to support Feldman's conviction if, viewing the evidence in the light most favorable to the government and respecting the jury's ability to judge the credibility of the witnesses, resolve factual conflicts, and draw inferences, a rational jury could have found the elements of the crime beyond a reasonable doubt. *United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir.1987); *United States v. Talbert*, 710 F.2d 528, 530 (9th Cir.1983), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984).

The mail fraud statute, 18 U.S.C. § 1341, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

### Financial Statements

■ Counts 1 and 2 charged Feldman with causing two fraudulent financial statements for Grow Gear to be sent through the mails. Feldman's accountant testified at trial that Feldman told him to include an additional $148,000 in "innercompany" sales between Grow Gear and Versatool in Grow Gear's 1981 financial statement. Although he claimed he had documentation of the sales, Feldman provided none. The 1981 statement was sent to potential lenders.

At trial, a government auditor testified that his review of Grow Gear's records did not locate any documents verifying the sales. On cross-examination, Feldman's attorney showed the auditor a stack of documents which he claimed the auditor had failed to review. None of those documents, however, verified the $148,000 in additional sales.

It was for the jury to decide whether the sales were merely undocumented or were fraudulent. Because Feldman claimed to have documentation but produced none for his accountant or at trial, a rational jury could conclude that the statement was falsified and that Feldman caused it to be sent through the mails as part of a scheme to defraud.

### Recorded Documents

Counts 9, 12, 13, and 14 charged Feldman with causing to be sent through the mails documents from the County Recorder's office in connection with straw real estate transactions intended to conceal Feldman's assets from his creditors. Feldman now claims that the factual evidence of these mailings—which he does not dispute—is legally insufficient to support a mail fraud conviction, because it is not illegal to conceal one's assets from creditors.

■ Feldman cites *United States v. Carman*, 577 F.2d 556, 565 (9th Cir.1978) for its holding that funds concealed from creditors are not funds "stolen," "converted," or "taken by fraud" under 18 U.S.C. § 2314, which prohibits interstate transportation of stolen property. While it may be true that concealing money from creditors is not in itself a *criminal* act, the government need not characterize it as such to support a mail fraud conviction. It is sufficient if the mailings were part of a scheme to defraud, in this case a scheme to keep the ill-gotten gains from the burning of Grow Gear concealed from creditors. This contention is therefore without merit.

■ Feldman also asserts that these mailings occurred after his fraudulent scheme was complete and therefore do not constitute mail fraud. Mailings occurring after the receipt of the goods obtained by fraud are within section 1341 if they further the scheme to defraud by lulling the victims into a false sense of security and make the defendant's apprehension less likely. *United States v. Lane*, 474 U.S. 438, 451–52, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986). Here the indictment charged an overall scheme to defraud based on the various arsons and concealment of the insurance proceeds. The mailing of the record documents gave an appearance of legitimacy to the transactions meant to conceal the assets. Certainly the Merton Group, whose grant deed is the subject of the mailing in Count 14, would have known something was seriously amiss had it not received official confirmation of its purchase of Feldman's real property. Because Feldman knew record documents would be mailed following his complex real estate maneuvering, and because the mailings would not have been made but for his scheme to conceal his assets in order to defraud, the mailings did constitute mail fraud. *See United States v. Mitchell*, 744 F.2d 701, 703–04 (9th Cir.1984).

3. EXISTENCE OF A RICO ENTERPRISE

At trial, Feldman's counsel twice made a motion under Fed.R.Crim.P. 29 for a judgment of acquittal on Count 18 of the indictment, the RICO count. The district court denied both motions. On appeal, Feldman claims there was insufficient evidence of a RICO enterprise, because the government failed to show the existence of an enterprise separate and distinct from Feldman himself, failed to establish the common purpose and continuity required of a RICO enterprise, and failed to establish a pattern of racketeering separate from Feldman himself.

The section of the RICO statute under which Feldman was convicted, 18 U.S.C. § 1962(c), provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The statute defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982). The indictment charged that:

Grow Gear, Incorporated, Columbia Products Nevada Inc., Columbia Car Corporation, Allston Car Wash, Inc., Treasure Island Realty Inc., Hometech Corporation, ACO Development Corporation, Albert Feldman and Robert Feldman, associated with each other for the purpose of defrauding insurance companies and others through repeated acts of arson, together constitute an "enterprise."

■ Section 1961(4) places "no restriction upon the associations embraced by the definition" of enterprise. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). We agree with the Fifth Circuit that a RICO enterprise may consist of " 'a group of individuals associated in fact with various corporations,' " such as the group alleged here. *United States v. Thevis*, 665 F.2d 616, 625 (5th Cir. Unit B), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). *See also United States v. Aimone*, 715 F.2d 822, 828 (3d Cir.1983) (four individuals and one corporation constitute an enterprise), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979) (group of corporations properly an enterprise), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Each individual corporation is in itself a legal entity and, alone, may be charged as the RICO enterprise. *See United States v. Griffin*, 660 F.2d 996, 999 (4th Cir.1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982). But the enterprise charged in this indictment, consisting as it does of two

individuals and seven corporations, is a "group of individuals associated in fact" under 18 U.S.C. § 1961(4). Accordingly, the government must establish that the members of the group share a "common purpose of engaging in a course of conduct," and produce "evidence of an ongoing organization, formal or informal and ... that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. The government must also show that the enterprise exists "separate and apart from the pattern of activity in which it engages." *Id.*

### Enterprise Separate and Distinct from Feldman

 To be convicted of a RICO violation, the defendant "'person' must be a separate and distinct entity from the 'enterprise.'" *Schreiber Dist. Corp. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1396 (9th Cir.1986). Feldman first claims that because he was indistinguishable from the corporations he formed, there was no separate and distinct enterprise. Essentially, he argues that he was convicted under RICO for associating with himself.

 This court rejected a similar claim in *United States v. Benny,* 786 F.2d 1410 (9th Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Benny operated a sole proprietorship, which employed or otherwise associated with four other defendants. Benny claimed he could not be convicted for associating with his sole proprietorship. The court disagreed, holding that because the sole proprietorship employed others it was not merely an extension of Benny or a "one-man show," but an enterprise. *Id.* at 1415–16. If a defendant incorporated even a "one-man show," however, this court speculated that the resulting corporation might indeed be separable from the individual defendant, given the legal protections afforded by the corporate form. *Id.* at 1416 (citing *McCullough v. Suter,* 757 F.2d 142, 143–44 (7th Cir.1985)). *Cf. Sigmond v. Brown,* 645 F.Supp. 243, 246–47 (C.D.Cal.1986), *aff'd* 828 F.2d 8 (9th Cir.1987) (declining to apply *Benny* to find separate existence of peer

review committee named as enterprise *and* defendant).

A number of the corporations in count 18 were far from "one-man shows": Grow Gear, Allston Car Wash, Columbia Car, and Hometech all had employees and operated as active businesses. Hometech and Columbia Products were formed with Feldman's brother Albert. All the corporations enjoyed the legal status that incorporation provides. It was their very separate existence that made Feldman's activities possible and profitable, and "it is just this sort of legal shield for illegal activity that RICO tries to pierce." *McCullough,* 757 F.2d at 144. If the corporations had been mere extensions of himself, Feldman's creditors would have reached him long before he was indicted.

 If one corporation possesses an existence separate from its incorporator, clearly a group of corporations formed by a defendant is also distinct. Yet Feldman seeks to distinguish *Benny* on the ground that four employees of Benny's sole proprietorship were indicted as participants in the predicate acts of racketeering. Feldman appears to contend that, absent participation of their employees, the corporations he formed or ran were "one-man shows" and not separate from him, because only he was charged with illegal activity. This misapprehends the requirements for finding an associated-in-fact enterprise. Such an enterprise need not be a conspiracy, with its members sharing as a common objective the commission of a crime. *See Griffin,* 660 F.2d at 999–1000. Nor need the enterprise itself perform the illegal activity, or profit from it. *Sun Savings & Loan Assoc. v. Dierdorff,* 825 F.2d 187, 194–95 (9th Cir.1987); *see McCullough,* 757 F.2d at 144 (no allegation that enterprise's employees participated in illegal activity). It is therefore immaterial to the proof of a separate enterprise that only Feldman was named as a defendant.

We hold that a rational jury could find that the group of corporations and individuals charged as a RICO enterprise in the indictment existed separate and apart from Feldman himself.

*Common Purpose and Continuity*

The indictment alleges that the enterprise "associated ... for the purpose of defrauding insurance companies and others through repeated acts of arson." Feldman claims there was insufficient evidence of that common purpose, because Albert never intended to commit arson or defraud insurance companies, and the seven corporations cannot be shown to have "in some unexplained manner associated together to cannibalize themselves through arson."

This allegation presents some conceptual difficulty. As discussed above, the enterprise alleged here consists of seven corporations and two individuals, and as a result is an "associated in fact" enterprise for which a common purpose must be shown. Because seven of its members are corporations, however, the question arises as to what kinds of "purpose" a corporation must share in to be part of an association-in-fact.

■ Although individuals charged as an associated-in-fact enterprise often also will be charged with conspiracy and will be codefendants, *see, e.g., United States v. Hewes,* 729 F.2d 1302, 1306, 1311 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), RICO does not require intentional or "purposeful" behavior by corporations charged as members of an association-in-fact. Individual corporations may be entirely legitimate and need not benefit from the racketeering; in fact, the criminal activity charged may harm each individual corporation by looting it, or a corporation may be used by the defendant to line his or her pockets. *See United States v. Ambrose,* 740 F.2d 505, 512 (7th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985). Nor does RICO require that the association-in-fact be a conspiracy; there must be an enterprise regardless of whether there is any conspiracy to engage in the predicate acts of racketeering. *Griffin,* 660 F.2d at 999; *see also In re National Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.,* 636 F.Supp. 1138, 1160–61 (C.D.Cal.1986) (allegation of a combination to conspire not enough to constitute RICO

enterprise). What RICO does require as a showing of common purpose is "proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. The government must therefore show the existence of an organization among the various corporations, Albert, and Feldman, and show that the organization has some continuity.

There is little guidance as to what may constitute an "ongoing organization, formal or informal" when the association-in-fact is comprised of corporations and no conspiracy charge is leveled. In *Huber,* decided before *Turkette,* the Second Circuit found an enterprise of seven corporations all involved in hospital supply. Five were organizationally related as divisions or wholly owned subsidiaries, and the others shared assets. They were therefore "not merely unrelated businesses owned by the same person. They ... could be fairly characterized as a single business operated under various names and forms chosen by appellant to suit his own purposes and convenience." 603 F.2d at 395. The Fifth Circuit found a RICO enterprise under *Turkette* where the indictment named a group of individuals associated in fact with two corporations; both corporations and several individuals were also named as defendants to a RICO count and a RICO conspiracy count, and one of the corporations was the parent of the other. *Thevis,* 665 F.2d at 621 & n. 2, 625. In *Aimone,* the Third Circuit found an enterprise consisting of four individuals and one corporation where the individuals, all defendants to a RICO conspiracy charge, agreed to conduct the enterprise's activities through racketeering. 715 F.2d at 828.

■ Unlike *Thevis* and *Aimone,* however, no RICO conspiracy is alleged here. Neither the corporations nor Albert, the only individual besides Feldman listed as part of the enterprise, is named as a defendant, and Albert was never shown to have intended to commit arson or to defraud insurance companies. Whether the corporations and the two Feldmans consti-

tute an enterprise depends on objective interconnections and requires a careful scrutiny of the facts. *See Huber,* 603 F.2d at 396 ("each set of facts must be evaluated independently").

The indictment named Grow Gear, Columbia Products, Columbia Car, Allston Car Wash, Treasure Island Realty, Hometech, ACO Development, Albert, and Feldman as members of the enterprise. We address each member's participation in the enterprise in the order of its first association with Feldman.

Feldman's brother, Albert, was a partner in all of Feldman's pre–1977 operating businesses. He was the treasurer of Hometech, co-owner of both the Allston and Columbia car washes, formed Columbia Products with Feldman, and was a co-owner of Grow Gear. He filed the insurance claims for the Allston and Columbia fires. He had a bitter falling-out with Feldman over his interest in Grow Gear, and had no further contact with him after 1977.

Feldman and Albert incorporated Hometech in 1971. In 1972, Hometech and Treasure Island Realty purchased the Massachusetts motel and restaurant complex. Hometech employees remodeled the Allston car wash after the arson fire there in 1973.

Treasure Island Realty was the corporation Feldman substituted as mortgagee when in 1973 he increased the fire insurance on the Massachusetts restaurant, removing the name of ACO Development, which actually retained the mortgage interest. The proceeds from the insurance settlement for the arson were paid to Treasure Island Realty, and through it to Feldman, rather than to the true holders of the mortgage interest.

Allston Car Wash, bought by Feldman and Albert in 1968, suffered two arson fires in 1973 and 1975. The brothers recovered $15,000 in insurance proceeds. Columbia Car Wash, also purchased by the brothers in 1968, was hit by arson twice in 1976, which essentially shut the business down. The $16,200 in insurance proceeds was paid to the brothers in 1983.

Columbia Products was incorporated by Albert and Feldman in 1976, solely to purchase Grow Gear. The down payment came from assets from the two car washes. In 1981, following the Grow Gear decline, arson destroyed Grow Gear's facility. Feldman eventually recovered $2.6 million. Feldman's subsequent maneuverings and real estate transactions, the subject of four of the mail fraud counts, kept these proceeds from his creditors.

The remaining corporation named in the indictment, ACO Development, sold the Massachusetts property to Treasure Island Realty and Hometech in 1972. ACO Development was thus a part of the enterprise at the beginning of the pattern of racketeering. Its three partners were not subsequently involved with Feldman other than in litigation to recover the insurance proceeds from the arson.

While the corporations and individuals above described are not so interconnected as to constitute a single business operated under various names to suit Feldman's purposes, *see Huber,* 603 F.2d at 395, we think they nevertheless possess the organization and continuity required of a RICO associated-in-fact enterprise. Feldman was the principal in each venture; Albert was his coprincipal in every operating business, although he generally took his orders from Feldman. Hometech employees remodeled the Allston car wash. The general manager of the Allston car wash oversaw the Columbia facility, stayed behind to sell the car washes, and then came out to California to work at Grow Gear. There is therefore overlap in personnel and organizational structure among the businesses, which although not complete, is significant considering the different businesses involved and the geographical distance between Massachusetts and California.

The various corporations also shared financial connections. ACO Development was the original owner and the defrauded mortgagee of the Massachusetts property which subsequently was co-owned by Hom-

etech and Treasure Island. Assets from the two car washes were used to buy Grow Gear through Columbia Products.

These connections survive comparison with linkages found sufficient for a RICO associated-in-fact enterprise when the members of the enterprise are individuals. In *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), the Eighth Circuit recognized that an enterprise composed of legitimate organizations would more easily fall under RICO because "legitimate organizations tend to have a definite structure and clear boundaries." *Id.* at 662. The enterprise charged in *Bledsoe*, however, consisted of individual defendants associated with two agricultural co-ops. The co-ops themselves were not charged as defendants or as the enterprise. The court interpreted *Turkette* to require a common purpose and continuity of structure and personnel, and found the government had failed to show any overarching structure or common control over the separate associations of individuals. *Id.* at 665–66. In this case, however, Feldman and Albert participated in each operating business; although Albert left in 1977 before the Grow Gear fire, continuity does not require that each member of the enterprise participate in it from beginning to end. *United States v. Hewes*, 729 F.2d at 1310.

The Eighth Circuit followed *Bledsoe* in *United States v. Lemm*, 680 F.2d 1193 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983), in which the defendants were charged with conspiracy to violate RICO. The enterprise charged was an arson ring consisting of the individual defendants. The *Lemm* court found that the structure of roles in the ring remained constant, although the participants changed, and held that "the requirement of continuity of personnel is not absolute," and that the determinative factor is whether "the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority." *Id.* at 1199. The court found such a pattern in the "open, continuous leadership" of one individual. *Id.* at

1200. Here Feldman's leadership was open and continuous, and his brother's secondary role also persisted throughout most of the enterprise.

In *United States v. Tillett*, 763 F.2d 628 (4th Cir.1985), the Fourth Circuit found that despite changes in personnel, evidence of an operational structure was enough to show an ongoing organization for a RICO enterprise. *Id.* at 631. As the Eleventh Circuit stated in *Hewes*, it is not necessary that all the members of an enterprise have participated throughout its life. 729 F.2d at 1310. Instead, the government must show that the participants overlap to a significant degree. *Id.* at 1311. There appears to have been substantial overlap here.

We find there was evidence from which a rational jury, viewing this evidence in the light most favorable to the government, could have found a RICO enterprise beyond a reasonable doubt. We therefore affirm the trial court's denial of Feldman's Rule 29 motions.

Feldman also challenges the district court's refusal to give his requested instruction defining a RICO enterprise. The proposed instruction stated "[i]f a corporation is so closely held that it becomes inseparable, the same or a part of, the defendant, it cannot become part of an 'enterprise' with defendant." As the district court stated, and we discussed above, that statement of the law is misleading and would have confused the jury. The district court did not abuse its discretion in refusing to give the instruction. *See United States v. Washington*, 797 F.2d 1461, 1475 n. 22 (9th Cir.1986) (defendant not entitled to specific instruction requiring a distinction between the enterprise and the defendant).

### Pattern of Racketeering Separate from the Enterprise

▮ Feldman's final challenge to his conviction on the RICO count is that the evidence failed to show that the alleged enterprise had an existence separate and apart from the pattern of racketeering activity. This court has yet to rule on wheth-

er a RICO enterprise must have an " 'ascertainable structure,' distinct from that inherent in the pattern of racketeering activity," as required by the Eighth Circuit in *Bledsoe*, 674 F.2d at 665 (citation omitted). The Third and Fourth Circuits agree that a separate existence is necessary. *See United States v. Riccobene*, 709 F.2d 214, 223–24 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *Tillett*, 763 F.2d 628, 632. The Second and Eleventh Circuits have rejected this requirement. *See United States v. Bagaric*, 706 F.2d 42, 55 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Weinstein*, 762 F.2d 1522, 1537 n. 13 (11th Cir.), *modified*, 778 F.2d 673 (1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986). Because we believe that the enterprise alleged here meets the more stringent standard, we need not decide the issue in this case. *See United States v. Kirk*, 844 F.2d 660, 664 (9th Cir.1988); *United Energy Owners Comm., Inc. v. United States Energy Management Syst., Inc.*, 837 F.2d 356, 363 (9th Cir.1988).

The evidence presented at Feldman's trial showed an enterprise with an ascertainable structure separate from the racketeering acts. The corporate entities had a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure. *Kirk*, 844 F.2d at 664. Each functioned to achieve objectives that were not illegal: for Hometech, the building of modular homes; for Allston and Columbia, the operation of a car wash business; for Grow Gear, the manufacture of tools; for Columbia Products and Treasure Island Realty, the acquisition of legitimate businesses. Legal activity is also probative of a separate existence. *United Energy Owners*, 837 F.2d at 364. Those corporations created by Feldman that could be construed as existing only to defraud creditors, i.e. QPT Investors and Lion Enterprises, were not charged as part of the enterprise.

The individual corporations together comprised, as Allston's general manager put it, Feldman's "business interests."

They existed for the purpose of making money for Feldman and Albert. The illegal purposes to which Feldman put them were subsidiary to that legitimate goal. The only individual charged as a member, Albert, was involved in the enterprise as a co-owner and partner; as Feldman himself insists, Albert was never shown to have intended to commit any illegal act. On these facts, a rational jury could easily find an enterprise separate and distinct from the pattern of racketeering activity.

### 4. FORFEITURE

18 U.S.C. § 1963(a) (1982) provides:

Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established operated, controlled, conducted or participated in the conduct of, in violation of section 1962.

The jury returned a special verdict of forfeiture of $1,986,990, the amount it determined that Feldman recovered in insurance proceeds from the arsons. At sentencing, the court ordered Feldman to pay an additional $1,986,990 in restitution.

*Forfeiture Procedure*

Feldman first argues that the forfeiture procedure at trial violated his due process rights. During trial, the government produced evidence of the extent and location of the insurance proceeds. Feldman presented no rebuttal evidence. After the jury returned its guilty verdict, the judge gave the jury special instructions on forfeiture and a special verdict form. Before the jury retired to deliberate on the forfeiture issue, Feldman's counsel indicated he wanted an evidentiary hearing on the extent of Feldman's interest in the insurance proceeds, saying "no effort was made in terms of the forfeiture provisions in terms of

dollar amounts to rebut," and expressing concern that the jury would simply add up the amounts on the special verdict form. The district court denied the request for a hearing. In declining to "reopen the case," the court pointed out that the government had presented its evidence at trial of the amounts received, Feldman had failed to rebut or to submit proposed instructions, and that the jury had before it a special verdict form allowing it to consider each forfeitable asset separately.

Feldman claims that the failure to allow him to present evidence and argument on the forfeiture issue at a separate evidentiary hearing after trial was unconstitutional, implicating both his right to remain silent at trial and his right not to be deprived of property without due process of law.

The procedure used by the trial court was not necessarily unconstitutional. In *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), a homicide defendant was sentenced to death after a jury found him guilty and failed to recommend mercy following a single deliberation. Although the defendant had to choose between not testifying at trial or pleading for mercy and thus potentially damaging his case-in-chief, the Supreme Court held it did not violate the constitutional privilege against self-incrimination for a state to determine guilt and punishment in a single trial. *Id.* 402 U.S. at 213, 91 S.Ct. at 1470. The Court indicated, however, that its "function is not to impose on the States ... what might seem to us a better system," but rather simply to determine whether such a procedure violated the federal constitution. *Id.* at 195–96, 221, 91 S.Ct. at 1461, 1474.

By requiring separate instructions and separate deliberations on the forfeiture issue, the trial judge in this case gave more protection to Feldman than was afforded to the defendant in *United States v. Washington*, 797 F.2d 1461, 1477 (9th Cir.1986), where the jury deliberated on guilt and forfeiture at the same time. The issue of bifurcating the proceedings, however, was not raised in *Washington*. We believe nonetheless that the procedure used at Feldman's trial may have forced Feldman to choose between his right not to incriminate himself and his need to present evidence on the extent of his assets subject to forfeiture, thus posing a real possibility of prejudice.

The judge instructed the jury that the amounts subject to forfeiture were $264,000 from the Treasure Island fire, more than $16,000 from the car wash fires, and $2,300,000 from the Grow Gear fire, for a total of $2,580,000. The jury identified the $1,986,990 in its forfeiture verdict as $262,500 in insurance proceeds from the Treasure Island fire and $1,724,490 from the Grow Gear fire. The jury did not require forfeiture of any money received as a result of the car wash fires. At trial, a government expert witness had presented a chart detailing the amounts of the insurance proceeds that went to Feldman and the amounts paid to creditors or used to purchase the new Grow Gear building and equipment, but it is unclear whether and to what extent the jury relied on those figures in reaching its decision on the amounts to be forfeited. Under the trial procedure, the only way Feldman could have presented any evidence of his own about the amounts paid to him would have been to take the stand to dispute the amounts in the government's evidence, thus relinquishing at least in part his right not to testify against himself on the substantive counts. *See Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958).

The Third Circuit has succinctly described the problem we face here:

> Realistically, from the jurors' standpoint, the temptation to draw an adverse and impermissible inference from the defendant's failure to testify cannot but be intensified if he testifies about his property yet remains conspicuously silent about the charges against him. A defendant who does not wish to testify in his criminal trial, therefore, as counsel expressed it, faces a Hobson's choice.

*United States v. Sandini*, 816 F.2d 869, 874 (3d Cir.1987). Faced with a similar challenge to a criminal forfeiture proceed-

ing under 21 U.S.C. § 853 (Supp. II 1984), the *Sandini* court exercised its supervisory power to require that "in personam forfeiture proceedings, including evidence on that issue, be bifurcated from the guilt phase of criminal trials." *Sandini*, 816 F.2d at 874. Under that bifurcation, both the defense and the prosecution may present evidence on forfeiture to the jury after it returns its guilty verdict. *Id.*[1]

The District of Columbia Circuit has declined to adopt such a requirement. In *United States v. Perholtz*, 842 F.2d 343, 367–68 (D.C.Cir.1988) (per curiam), the court approved a unitary procedure under which the jury deliberated on guilt and forfeiture at the same time, albeit with a special verdict form and instructions not to consider forfeiture unless the jury first found the defendant guilty of the RICO charge. Commentators have generally favored bifurcation. *See, e.g.*, Markus, *Procedural Implications of Forfeiture under RICO, the CCE, and the Comprehensive Forfeiture Act of 1984: Reforming the Trial Structure*, 59 Temp.L.Q. 1097, 1102 (1986); Reed & Gill, *RICO Forfeitures, Forfeitable "Interests," and Procedural Due Process*, 62 N.C.L.Rev. 57, 82–83, 101–02 (1983); Note, *A Proposal to Reform Criminal Forfeiture under RICO and CCE*, 97 Harv.L.Rev. 1929, 1938–40 (1984).

Although we find the reasoning in *Sandini* to be particularly persuasive, we do not adopt a blanket requirement that guilt and forfeiture proceedings be bifurcated completely.[2] Under some circumstances a single procedure may be unfair, where for example the evidence is very complex, there are evidentiary difficulties, or testimonial privileges are clearly implicated. There may be other situations, however, in which any evidence the defendant might

present after trial will not affect the jury's decision on forfeiture. For example, when the government seeks forfeiture of a defendant's interest in a RICO enterprise under 18 U.S.C. § 1963(a)(2), "issues of guilt and forfeiture are likely to converge," as the forfeiture of the entire interest follows automatically on a finding that the enterprise was conducted through a pattern of racketeering. Markus, *supra*, at 1111; *see United States v. Cauble*, 706 F.2d 1322, 1349 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). By contrast, when the jury orders forfeiture of the proceeds of illegal activity, it must determine the extent of the proceeds or whether a particular interest or profit was acquired or maintained in violation of RICO. Markus, *supra*, at 1111.

We therefore exercise our supervisory power to hold that trial courts should bifurcate forfeiture proceedings from ascertainment of guilt, requiring separate jury deliberations and allowing argument of counsel. The trial judge may exercise discretion in deciding whether to hold an evidentiary hearing. If the defendant can show, by affidavits or otherwise, that a hearing is required on the extent of his or her assets subject to forfeiture, the court should allow evidence on the issue. Evidence received at this phase may not be used on appeal or at retrial to sustain the conviction, nor in post-trial motions. *See Sandini*, 816 F.2d at 874. This procedure preserves the rights of defendants and should clarify issues in complex trials, without unnecessarily adding to the time to try less complex cases where the extent of forfeitable property is clear and the jury would not benefit from a separate evidentiary hearing.[3]

1. The trial court in *Sandini* bifucated the jury deliberations, allowing the defendant to present arguments of counsel, but no evidence, to the jury before the forfeiture deliberations. *Sandini*, 816 F.2d at 872.

2. We note that the forfeiture provision at issue in *Sandini*, 21 U.S.C. § 853(d), creates "a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter ... is subject to forfeiture" if the prosecution shows by a preponderance of the evi-

dence that the property was acquired during the relevant period and likely came from no other source. The RICO forfeiture provision in issue here, 18 U.S.C. § 1963(a), establishes no such presumption. To that extent, Feldman's position is more favorable than that of the defendant in *Sandini*. *See Sandini*, 816 F.2d at 874.

3. We do not express an opinion on how courts should address the rights of third parties in property subject to forfeiture. *See generally* Reed & Gill, *RICO Forfeitures, Forfeitable "Inter-*

Feldman should be allowed on remand to present affidavits or other documents to support his claim that an evidentiary hearing is necessary. The affidavits must indicate with specificity a triable issue that Feldman's interest in the insurance proceeds was less than the $1,986,990 ordered forfeited. If the trial judge grants the request for a hearing, a new jury will have to be convened to consider the forfeiture evidence.[4]

*Eighth Amendment Issues*

Feldman claims that the order that he forfeit $1,986,990 and pay restitution in the same amount as a condition of five years' probation on the mail fraud counts, in combination with his concurrent sentences of ten years for interstate transportation of funds obtained by fraud and ten years for RICO violations, constitutes cruel and unusual punishment.

■ The eighth amendment prohibits "excessive fines ... cruel [and] unusual punishments." U.S. Const. amend. VIII. Forfeiture under RICO is punishment subject to the limits imposed by the eighth amendment. *United States v. Busher*, 817 F.2d 1409, 1413–14 (9th Cir.1987). When a defendant "makes a prima facie showing that the forfeiture may be excessive, the district court must make a determination, based on appropriate findings, that the interest ordered forfeited is not so grossly disproportionate to the offense committed as to violate the eighth amendment." *Id.* at 1415; *see also United States v. Little-field*, 821 F.2d 1365, 1368 (9th Cir.1987) (same requirement for forfeitures under 21 U.S.C. § 853).

Such a determination will more often be necessary when the basis for the order of forfeiture is section 1963(a)(2), which provides for mandatory forfeiture of "any interest in ... any enterprise which [the defendant] has established operated, con-

trolled, conducted, or participated in the conduct of, in violation of section 1962." Under this subsection, eighth amendment concerns may arise when a defendant must forfeit his or her entire interest in an otherwise legitimate business, even though only a few minor acts in the course of conducting the business were the predicate acts sufficient for a RICO violation. *See Busher*, 817 F.2d at 1413; *United States v. Horak*, 833 F.2d 1235, 1251 (7th Cir.1987).

■ Section 1963(a)(1), however, provides for forfeiture of "any interest ... acquired or maintained in violation of section 1962," which includes the profits of racketeering activity. *Russello v. United States*, 464 U.S. 16, 22 (1983). When the district court orders that the defendant forfeit the profits gained from illegal activity, it is hard to imagine how such a forfeiture could constitute cruel and unusual punishment. *See Horak*, 833 F.2d at 1241 n. 4. The jury found that Feldman had received $1,986,990 in insurance proceeds from the Treasure Island and Grow Gear arsons. Forfeiture of that amount was not excessive.

■ The addition of restitution does not make the penalty constitutionally excessive. Under the Federal Probation Act, 18 U.S.C. § 3651 (1982), a district court may suspend imprisonment and place a defendant on probation with the condition that the defendant "make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." Feldman was sentenced to probation rather than imprisonment on the mail fraud counts on the condition that he make restitution to his victims. This sentencing option is not denied to the district court because a defendant must also forfeit the proceeds of illegal activity. The amount of restitution was less than the amount set out in the indictment, which

---

*ests," and Procedural Due Process*, 62 N.C.L.Rev. 57 (1983). As amended by the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98–473, tit. II, ch. III, § 302, 98 Stat. 2040 (1984), the current RICO forfeiture statute provides procedures for hearings to determine third party rights in forfeited property. 18 U.S.C. § 1963(*l*) (Supp. IV 1986).

**4.** If Feldman fails to make a showing justifying an evidentiary hearing, no relitigation of the forfeiture will be necessary. Feldman never requested the right to argue the forfeiture issue to the jury in the absence of an evidentiary hearing.

alleged that Feldman recovered $2,580,000 in insurance proceeds. This court has held that the amount of restitution may be fixed by referring to the amount of loss set out in the indictment or plea agreement, or by other methods that are fair and reliable. *United States v. Whitney*, 838 F.2d 404, 404 (9th Cir.1988), *modifying* 785 F.2d 824, 826 (1986).

■ Feldman's ten-year sentence on the RICO count is well within the twenty-year statutory limit imposed by 18 U.S.C. § 1963(a), and his concurrent ten-year sentence under 18 U.S.C. § 2314 is the statutory maximum. The sentences do not violate the eighth amendment. *See Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (substantial deference to legislative determinations of punishment and to trial court's sentencing discretion); *United States v. Endicott*, 803 F.2d 506, 510 (9th Cir.1986) (sentence within statutory limits generally not subject to review).

For eighth amendment purposes, however, we must consider the total punishment imposed. *Busher*, 817 F.2d at 1415 n. 10. Feldman's penalty is unconstitutional only if it is grossly disproportionate to his offense. *Id.* at 1415. No gross disparity appears here. Feldman's offenses were serious, and the penalty is not unduly harsh. We are not faced with a situation in which a defendant is being made to forfeit a 92% interest in a $3 million corporation, as well as all of another corporation and considerable real estate, for fraudulent conduct amounting to $335,000. *See id.* at 1414. *See also Horak*, 833 F.2d at 1251 (possible eighth amendment violation where forfeiture order would reach stock worth $8 million for acts of racketeering worth $712,000); *cf. United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir.1987) (no apparent eighth amendment violation where penalty for RICO conviction included imprisonment, restitution, and forfeiture), *cert. denied*, ─── U.S. ───, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988).

We hold that Feldman's penalty does not violate the eighth amendment.

### 5. OTHER ALLEGATIONS

Feldman makes a potpourri of other challenges to his conviction and the forfeiture procedure. None has merit. First, Feldman objects that the special verdict form did not instruct the jury that it must find beyond a reasonable doubt that the proceeds to be forfeited resulted from racketeering. This is immaterial, as the court's instructions to the jury on forfeiture specified the proper standard three times. Second, he argues that the special verdict form should have required the jury to itemize the acts of racketeering of which the jury unanimously found him guilty. This claim is frivolous, as Feldman's counsel rejected such a form.

Feldman also alleges that the RICO instruction on Count 18 should have included a definition of the state arson alleged as six of the predicate acts. Where there is no objection at trial, this court reviews the failure of the district court to give certain instructions for plain error. *United States v. Bustillo*, 789 F.2d 1364, 1367–68 (9th Cir.1986). Feldman claims that as given, the instructions would lead a reasonable juror to believe that he only needed to be *chargeable* with arson, not *convictable*, and that the jury was not instructed as to the meaning of "malice," required by California law for a conviction of arson. This argument fails. First, the instructions required that the jury find beyond a reasonable doubt that Feldman *committed* at least two of the acts alleged. Second, the instructions defined "willfully," which made it clear that a negligent or reckless act would not constitute arson.

■ Feldman next asks us to find error in the jury's inadvertent viewing of the forfeiture allegations during deliberations. During the guilt phase of trial, the page of the indictment alleging forfeiture was submitted to the jury as the result of a clerk's error. The court clerk retrieved the copies of the indictment and inquired who had read it; only one juror had. Feldman's counsel moved for a mistrial on the basis of this mistake. We review the district court's denial of the motion for an abuse of discretion. *United States v. Morris*, 827 F.2d 1348, 1351 (9th Cir. 1987), *cert. denied*, ───

U.S. ___, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). The indictment was promptly retrieved, and only one juror had read the forfeiture allegation. The judge offered to advise the jury to disregard the allegation, but Feldman's counsel indicated he preferred that no curative action be taken. The judge did not abuse his discretion.

■ Feldman likewise challenges the district court's failure to inquire at sentencing whether counsel had reviewed the presentence report for any factual inaccuracies. After the arguments on this appeal, we were furnished with a partial transcript of the sentencing procedures which clearly indicates that the court inquired whether Feldman and his counsel had read the report and counsel's affirmative response.

Counsel objected to the manner in which the United States Attorney's version of the facts of the case were set forth in the report. In response, the judge stated that he was relying on the evidence presented at trial and on the verdict reached by the jury. The court substantially complied with Fed.R.Crim.P. 32(c)(3)(D) which "requires the district court, in entertaining a challenge to a presentence report, either to decide the challenge on the merits, or to state that no finding is necessary because the court will not rely on the controverted information." *United States v. Ibarra*, 737 F.2d 825, 827 (9th Cir.1984).

Feldman also claims that the prosecutor committed misconduct during closing argument by referring to fifty-four business lawsuits involving Feldman, implying that there were other lawsuits the government was unable to locate; to defense counsel's presentation of a stack of documents as an attempt to "intentionally mislead" the jury; and to the victims of Feldman's scheme. Feldman characterizes the latter as an invitation for revenge.

■ An improper closing argument by the prosecutor is grounds for reversal only if it constitutes plain error. *United States v. Lopez*, 803 F.2d 969, 972 (9th Cir.1986), *cert. denied*, ─ U.S. ─, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987). Hard blows are permissible in closing arguments and even when statements go beyond reasonable inferences made from the evidence, reversal is proper only if they were likely to have prejudiced the defendant. *United States v. Vaccaro*, 816 F.2d 443, 451 (9th Cir.), *cert. denied*, ─ U.S. ─, 108 S.Ct. 295, 98 L.Ed.2d 220 (1987).

■ There was no plain error. The reference to undiscovered lawsuits was made in response to defense arguments implying that the government used improper tactics in its investigation. As such, it could be viewed as invited response. *See Lopez*, 803 F.2d at 972. It also followed a statement that "not necessarily all [the lawsuits were] for or against Mr. Feldman," and therefore did not necessarily cast only a negative light on the defendant. The reference to the stack of documents as "intentionally mislead[ing]" was proper, given the manner in which defense counsel presented them and their failure to authenticate the alleged sales.

■ Nor was it plain error for the prosecutor to characterize the trial as "a trial for Henry Osowski and all those people like him, all the Henry Osowskis of the world whom this man [has] touched and tarnished for 13 years." This was a reasonable response to the defendant's counsel's argument that "American business" was at stake in this trial, and a permissible attempt to recharacterize the issues. It certainly falls short of "victim impact information," as Feldman contends.

■ Feldman's final claim is that he received ineffective assistance of counsel. For ineffective assistance, counsel must have failed to act as a reasonably competent attorney and the failure must result in prejudice, i.e., be reasonably likely to have altered the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). Feldman cites his counsel's failure to make a Rule 29 motion on the mail fraud counts, to challenge inadmissible hearsay evidence and evidence regarding Feldman's failure to pay back debts, and to request jury instructions on unanimity and the elements of state law arson.

The first contention is not ineffective assistance because, as discussed above, the mail fraud counts were supported by suffi-

cient evidence. The second allegation is more troublesome. Feldman's attorney did not object to unsolicited hearsay by a former Grow Gear employee that Feldman had gallon drums of oil moved inside Grow Gear before the fire. The government suggests that counsel's failure to challenge may have been a tactical decision not to highlight the testimony for the jury. While such an argument could be made regarding almost every failure to object, Feldman's counsel's silence is not ineffective assistance for another reason: it was unlikely to have altered the trial's outcome. Counsel argued in closing that the testimony was motivated by the employee's anger at Grow Gear's shutdown. The circumstances surrounding the Grow Gear arson gave ample evidence from which the jury could conclude Feldman had caused the arson. The evidence regarding back debts was similarly unlikely to have been prejudicial. The evidence that Feldman was a poor credit risk was overwhelming without the challenged testimony.

The failure to request instructions on the elements of arson under state law and to request a unanimity instruction do not reach the level of ineffective assistance because, as explained above, the court's instructions on the predicate arsons and unanimity were adequate.

## CONCLUSION

The judgment of conviction is AFFIRMED. We REMAND to the district court for determination of whether Feldman is entitled to an evidentiary hearing on the forfeiture issue.

## APPENDIX

In 1971, Robert Feldman (Feldman) and his brother Albert incorporated Hometech, Inc., a Delaware corporation doing business in Massachusetts. Hometech manufactured prefabricated concrete modular homes. In 1972, Hometech and Treasure Island Realty, Inc. (with Feldman signing as president of both corporations), purchased ACO Development Corp., dba Treasure Island, a lakefront motel and restaurant complex on ten acres in Massachusetts, intending to build a condominium complex.

The purchase price of the property was $390,000. Hometech borrowed $100,000 for a down payment, and the seller of the property, Henry Osowski, and his partners carried a note for the remaining $290,000.

Feldman began some preliminary construction, but was plagued by local opposition to the project. In January 1973, Feldman requested and received an increase in the restaurant building's fire insurance coverage from $120,000 to $280,000. Feldman also changed the name of the mortgagee on the insurance policies from ACO Development Corp. to Treasure Island Realty. On March 23, 1973, a fire destroyed the restaurant building. Investigators determined that the fire had been set intentionally. Insurance proceeds of $264,000 went to Treasure Island Realty and through it to Feldman. Feldman abandoned the development. Osowski was forced to pay off the first mortgage to recover the property, and in 1974 Hometech went bankrupt.

Four months after the Treasure Island fire, another fire damaged the office of a business owned by Feldman and Albert, Allston Car Wash, Inc. A fire broke out in another room and in a storage room in October of 1975. Albert submitted an insurance claim after each fire and the corporation recovered a $15,000 settlement. The brothers later sold the car wash.

Columbia Car Wash, another business operated by a Massachusetts corporation incorporated by the brothers, Columbia Car Corp., suffered two fires in September and October 1976, after Albert had tried unsuccessfully to sell the business. Both fires were incendiary. The insurance company settled the claim for $16,200 in 1983. The brothers abandoned the carwash, which was seized by the City of Boston for tax deficiencies.

Feldman came to Los Angeles in 1976, followed by Albert later in the year. The brothers formed Columbia Products, Inc., a Nevada corporation, in order to purchase Grow Gear, Inc., with a down payment from assets from the two carwashes. The brothers had a falling-out and Albert left in 1977. Grow Gear was a profitable manufacturer of precision gears and lawn tools,

but in the next six years its reputation and product declined as Feldman cut back work hours and falsified quality control tests. Bills went unpaid and the future of Grow Gear was in doubt. In 1979 Feldman incorporated a subsidiary of Grow Gear, Versatool, which at first operated in the same building and then moved across the street.

Grow Gear's business position worsened in 1981, with creditors suing for nonpayment of bills. The building's landlord gave notice that the rent would be increased 350%. Feldman, who had transferred Grow Gear and Versatool assets to a money market account in northern California, directed his accountant to send out financial statements claiming sales which later could not be verified. He discontinued payments on leases for both Versatool and Grow Gear and shipped many valuable items out of the facility. In May of 1981 Feldman increased Grow Gear's insurance coverage from $1.1 million to more than $2.7 million. He later failed to pay his insurance premiums, and received a notification that his coverage would be cancelled after a ten-day grace period from January 29, 1982, the due date for payment.

On January 30, 1982, a fire destroyed Grow Gear. Feldman was en route to Taiwan. The fire was intentionally set, with a time clock as the mechanism for delayed ignition. Feldman claimed and received more than $2.6 million in insurance proceeds from the fire by October of 1982.

Feldman used part of the insurance proceeds to start Grow Gear again. With a $463,000 judgment pending against him, Feldman then "sold" Grow Gear's assets to the manager of the Grow Gear facility, Ronald Gerhardt, for $1 cash and $600,000 in promissory notes. Feldman then incorporated QPT Investors, a Delaware corporation, and assigned to it all his interest in the promissory notes. Using the name "Aba Mezie" as president of QPT, Feldman reconveyed the promissory notes back to Gerhardt. In June of 1983, after his creditors questioned Gerhardt, Feldman accepted a deed to real property worth $500,000 from Gerhardt in payment for Grow Gear and immediately assigned that interest to QPT. QPT then sold the property to the Merton Investment Group for a down payment of $240,000 and a promissory note for $260,000 secured by a trust deed.

As "Aba Mezie," Feldman agreed to subordinate the deed to a lender for a construction loan to the Merton group, but then sold the deed to Lion Enterprises, an entity Feldman created under the name of "Robert Faye." Feldman called Merton and as "Robert Faye" refused to honor the subordination agreement. Merton then bought back the trust deed from Lion for $500,000. "Faye" immediately wired $265,000 to Bank Leumi in Israel, aware that the United States government was prohibited from receiving detailed financial information from Israeli banks.

Feldman also managed to keep an additional $1 million in insurance proceeds from his creditors by first depositing them in a Grow Gear corporate account, then transferring most of them to his capital preservation account, and again transferring them, first to one Merrill Lynch account in California and then to another in New York, under the name Robert "Aba" Feldman. Feldman then transferred $900,000 of those funds and an additional $303,000 of insurance proceeds to the Merrill Lynch account in New York, and later transferred over $1 million to Bank Leumi, first in New York and then in Tel Aviv, in March of 1983.