164 F.3d 1191
 99 Cal. Daily Op. Serv. 135, 98 Daily Journal
D.A.R. 167
UNITED STATES of America, Plaintiff-Appellee,
v.
3814 NW THURMAN STREET, PORTLAND, OREGON, A TRACT OF REAL
PROPERTY, Defendant,
Gloria Ladum, Claimant-Appellant,
Chemical Bank; Multnomah County, Claimants.
 No. 97-35054.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 2, 1998.
Decided Jan. 5, 1999.
 
 E.J. Simmons, Portland, Oregon, for the claimant-appellant.
 Robert D. Nesler, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon; Helen J. Frye, District Judge, Presiding. D.C. No. CV 95-00940-HJF.
 Before: FERNANDEZ, RYMER and TASHIMA, Circuit Judges.
 Opinion by Judge TASHIMA; Dissent by Judge RYMER.
 TASHIMA, Circuit Judge:
 
 
 1
 Claimant Gloria Ladum ("Ladum") appeals from the district court's judgment ordering the forfeiture of $200,686.18 of equity in the defendant real property owned by Ladum, known as 3814 N.W. Thurman Street, Portland, Oregon (the "Property"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part. We first conclude that the government established probable cause to support forfeiture. We also conclude that the $200,686.18 the government seeks to forfeit constitutes "proceeds" attributable to Ladum's probable violations of the criminal code and, therefore, is subject to forfeiture. We further conclude, however, that forfeiture of the entire amount is an excessive fine in violation of the Eighth Amendment.
 
 I. BACKGROUND
 
 2
 In October, 1993, Ladum applied for a residential mortgage loan in the amount of $322,500 from Emerald Mortgage Corporation ("Emerald"). Ladum, a 70-year old widow, claims that she relied on her nephew, Clayton Ladum ("Clayton"), and her broker to prepare the necessary documents. The stated purpose of the loan was to refinance the existing mortgage on the Property and to fund improvements to other properties Ladum owned.
 
 
 3
 Ladum submitted to Emerald an unsigned loan application overstating her monthly income and failing to disclose outstanding liabilities totalling $108,356.63. The application also stated that Ladum had resided at the Property for the previous 14 years, when, in fact, she did not live there until December, 1993.
 
 
 4
 In addition, Ladum submitted to Emerald unsigned tax returns for the years 1990, 1991, and 1992, which represented her yearly adjusted gross income to be $99,396, $102,153, and $106,557, respectively, for a three-year total of $308,106. In June, 1993, Clayton asked Terry Meegan ("Meegan"), a C.P.A., to prepare "pro forma" tax returns for Ladum for these three years. The returns Meegan prepared and provided to Clayton were stamped "PRO FORMA-SEE COVER LETTER" and were accompanied by a cover letter stating, in part, that "[t]hese pro forma returns differ from the original versions filed with the Internal Revenue Service and do not purport to represent actual copies of the returns." When these pro forma returns were furnished to Emerald, however, they were not accompanied by the cover letter and the "pro forma" stamp marks had been obliterated. Further, the dates of preparation on the forms had been removed or changed. On the actual tax returns Ladum had filed with the Internal Revenue Service for the years 1990, 1991, and 1992, she listed her income as --$25,273, $14,312, and $38,247, respectively, for a three-year total of only $27,286.
 
 
 5
 At the time Ladum applied for the loan, Chemical Bank, whose accounts were insured by the Federal Deposit Insurance Corporation, underwrote all of Emerald's loans in excess of $202,000. As Ladum's loan met this criterion, Emerald forwarded Ladum's unsigned loan application and tax returns to Chemical Bank for its approval. Chemical Bank approved the loan, but required Ladum to sign the loan application and the tax returns at the closing. While Ladum was signing the tax returns, she noticed that the returns listed Meegan as the tax preparer.[1] At that time, Ladum also signed a promissory note and a deed of trust, in which Emerald was named as the beneficiary.
 
 
 6
 After the closing, Emerald assigned the note and trust deed to Chemical Bank. Of the $322,500 loan proceeds, Ladum used $200,686.18 to pay taxes and liens on the Property and otherwise to reduce liabilities on the Property.
 
 
 7
 The government filed an in rem forfeiture action against the Property pursuant to 18 U.S.C. § 981(a)(1)(C), based on the false statements that had been made on the loan application. See 18 U.S.C. § 1014 (knowingly making false statements to a financial institution to influence its actions); 18 U.S.C. §§ 1341 and 1343 (employing a scheme to defraud or obtain money by false or fraudulent pretenses using the United States mails and wire communications). Ladum filed a claim against the Property, as did the mortgage holder, Chemical Bank, and Multnomah County, for unpaid real property taxes.
 
 
 8
 The district court granted summary judgment in favor of the government, holding that there was probable cause to believe that the Property was forfeitable because it constituted or was derived from proceeds traceable to violations of §§ 1014, 1341, and 1343. The district court also denied Ladum's cross-motion for summary judgment, concluding that Ladum did not prove a defense to forfeiture. United States v. 3814 NW Thurman St., 946 F.Supp. 840, 843 (D.Or.1996). In its final judgment of forfeiture, the district court ordered the Property forfeited to the extent of $200,686.18. See United States v. 3814 NW Thurman St., 946 F.Supp. 843, 846-47 (D.Or.1996) ( ordering government to prepare a judgment so providing) ("Thurman St. II "). The court also ordered that upon the sale of the Property, Multnomah County would be paid first for unpaid real property taxes and Chemical Bank would be paid next for all principal and interest due under the promissory note. After these claimants were paid (and costs reimbursed), $200,686.18 was ordered forfeited to the United States. Finally, any remaining proceeds from the sale of the Property would be paid to Ladum. The district court also declined to consider "whether the forfeiture is excessive under the Eighth Amendment...." Id. at 846.
 
 II. STANDARDS OF REVIEW
 
 9
 We review a grant of summary judgment de novo. Blue Ridge Ins. Co. v. Stanewich, 142 F.3d 1145, 1147 (9th Cir.1998). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the law. Id. "[T]he question of whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate." United States v. Bajakajian, 524 U.S. 321, ---- - ---- n. 10, 118 S.Ct. 2028, 2037-38 n. 10, 141 L.Ed.2d 314 (1998) (citing Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
 
 III. DISCUSSION
 
 10
 In civil forfeiture actions under § 981, the government must make an initial showing of probable cause that the defendant property is forfeitable. See United States v. Ursery, 518 U.S. 267, 289, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). Once the government has demonstrated probable cause to support forfeiture, the burden shifts to the claimant. Id. The claimant can then either refute the government's showing of probable cause, United States v. One 56-Foot Motor Yacht Named the Tahuna, 702 F.2d 1276, 1281 (9th Cir.1983), or provide an affirmative defense to forfeiture, United States v. Real Property 874 Gartel Drive, 79 F.3d 918, 923 (9th Cir.1996).
 
 A. Probable Cause
 
 11
 To satisfy its burden of establishing that there is probable cause to forfeit a property, the government must prove that it had reasonable grounds to believe that the property was forfeitable, "supported by less than prima facie proof but more than mere suspicion." Id. at 922 (quoting Tahuna, 702 F.2d at 1282). Under § 981(a)(1)(C), property is forfeitable if it "constitutes or is derived from proceeds traceable to a violation of section ... 1014 ... or a violation of section 1341 or 1343...." 18 U.S.C. § 981(a)(1)(C).
 
 
 12
 Ladum contends that the government failed to demonstrate probable cause that the Property constituted or was derived from proceeds of violations of §§ 1014, 1341, or 1343. She argues that some of the evidence adduced by the government to support its probable cause showing was unreliable because it was hearsay. Probable cause, however, may be supported by otherwise inadmissible hearsay. 874 Gartel Drive, 79 F.3d at 922. We conclude that the affidavits of FBI Agent Gordon Compton set forth sufficient undisputed facts to establish probable cause.
 
 
 13
 First, the government had probable cause to believe Ladum had violated § 1014. Section 1014 prohibits the making of "any false statement ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application ... or loan...." 18 U.S.C. § 1014. Agent Compton's affidavit set forth evidence that Ladum had signed the "pro forma" tax returns and the loan application, both of which contained false statements about her liabilities and income, as well as other misrepresentations designed to make the approval of her loan more likely. Ladum submitted these false statements to Chemical Bank, which was insured by the FDIC.
 
 
 14
 The government also established probable cause to believe that Ladum had violated §§ 1341 and 1343. A person is guilty of violating § 1341, if she used the United States mails in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses. 18 U.S.C. § 1341. Section 1343 prohibits the same offense perpetrated by use of wire communications. 18 U.S.C. § 1343. Section 981 permits forfeiture based on violations of §§ 1341 and 1343, so long as the offenses affected a financial institution. 18 U.S.C. § 981(a)(1)(C). As stated above, the government adduced ample evidence that Ladum submitted false statements inflating her income and omitting mention of her liabilities. Further, the uncontroverted evidence showed that the processing and closing of the loan involved use of the United States mails, as well as telephone and facsimile wire communications. Finally, Chemical Bank was clearly a financial institution insured by the FDIC.
 
 
 15
 As part of its initial burden, the government must also show probable cause to believe that the $200,686.18 of equity in the Property constituted "proceeds" of Ladum's offense. Ladum contends that the $200,686.18 does not constitute the proceeds of her offenses, nor is it derived from such proceeds. Under § 981(a)(1)(C), only property which "constitutes or is derived from proceeds traceable" to Ladum's offenses is subject to forfeiture. The government argues that the $322,500 loan made by Chemical Bank to Ladum in reliance on her false statements constitutes the proceeds of the violations of §§ 1014, 1341, and 1343. Because Ladum used $200,686.18 of that amount to reduce her debts and liabilities on the Property, she in effect increased her equity in the Property by that amount. Hence, the government contends that this increase in equity is forfeitable. Even construing the term "proceeds" narrowly and limiting it to the actual fruits of the offense, we agree that the government has demonstrated probable cause to believe that $200,686.18 of equity in the Property "constituted or was derived from proceeds" of Ladum's offenses.
 
 
 16
 Agent Compton's affidavit contained evidence that $200,686.18 of the $322,500 loan proceeds had been reinvested in the Property to pay off liabilities associated with the Property. The $200,686.18 was easily traced to the loan proceeds that Ladum received. Thus, the district court did not err in concluding that there was probable cause to support the forfeiture.
 
 B. Defenses to Forfeiture
 
 17
 Once the government has shown probable cause to support forfeiture, the burden shifts to the claimant to prove by a preponderance of the evidence that the defendant property is not subject to forfeiture. 874 Gartel Drive, 79 F.3d at 923.
 
 
 18
 Ladum contends that she is protected by the statutory "innocent owner" defense, which provides that "[n]o property shall be forfeited ... to the extent of the interest of an owner ... by reason of any act or omission established by that owner ... to have been committed without the knowledge of that owner...." 18 U.S.C. § 981(a)(2). Ladum insists that she had no knowledge of the falsity of the statements in her application, as she reasonably relied on her nephew, Clayton, and her real estate broker to arrange the loan and then signed papers at the closing without reading them. She relies on the notion that few homeowners ever actually read the closing documents before signing them.
 
 
 19
 The innocent owner defense does not apply, however, where the owner was willfully blind to false statements made in a loan application. See 874 Gartel Drive, 79 F.3d at 924. Ladum admitted in her deposition that, upon signing the previously unsigned tax returns at closing, she noticed that these returns listed Meegan as the preparer and she knew that someone other than Meegan had prepared her tax returns for 1990, 1991, and 1992. Thus, the district court did not err in concluding that the uncontroverted evidence showed that Ladum was willfully blind to the falsity of the tax returns she submitted and signed in connection with the loan application.
 
 C. Excessive Fine
 
 20
 Ladum also contends that the forfeiture was punitive and not remedial, and thus violated the Excessive Fines Clause of the Eighth Amendment.
 
 
 21
 If a civil forfeiture is punitive, then the Excessive Fines Clause applies. Austin v. United States, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In Gartel Drive, we held that "[t]he Excessive Fines Clause applies to § 981 forfeiture since nothing in the statute or its legislative history 'contradict[s] the historical understanding of forfeiture as punishment.' " 79 F.3d at 924 (citing Austin, 509 U.S. at 619, 113 S.Ct. 2801) (second alteration in the original).[2] And, although this is an in rem proceeding, the proceeds here do not meet the "instrumentality" test, which requires that the proceeds be "the actual means by which an offense was committed." Bajakajian, 118 S.Ct. at 2036 n. 8. "A forfeiture that reaches beyond this strict historical limitation is ipso facto punitive and therefore subject to review under the Excessive Fines Clause." Id. "If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." Id. at 2038.
 
 
 22
 In Bajakajian, the Court set forth the analysis that should be applied in determining whether a forfeiture is excessive. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." Id. at 2036. The culpability of the offender should be examined specifically, rather than examining the gravity of the crime in the abstract. See id. at 2038-39. The Court applied several factors to determine whether the forfeiture was grossly disproportionate. See id.
 
 1. Other Related Illegal Activities
 
 23
 The first factor is whether the violation was related to any other illegal activities. Id. at 2038. Nothing in the record indicates that Ladum was involved in any other illegal activity. She has not been charged with any related criminal activity or, for that matter, with any criminal activity at all.
 
 2. Other Penalties
 
 24
 Second, "[i]n considering an offense's gravity, the other penalties that the Legislature has authorized are certainly relevant evidence," id. at 2038 n. 14, as are the maximum penalties that could have been imposed under the Sentencing Guidelines, id. at 2038. Bajakajian suggests that the maximum penalties under the Guidelines should be given greater weight than the maximum penalty authorized by statute, because the Guidelines take into consideration the specific level of culpability of the offender. Id. at 2038 n. 14.
 
 
 25
 Here, the maximum penalties authorized by each of the relevant statutes (§§ 1014, 1341, 1343) are 30 years' imprisonment and a $1 million fine. Under the Sentencing Guidelines, however, the maximum criminal punishment Ladum could have faced, absent an upward departure, was six months' imprisonment and a fine that could be as low as $500 to $5,000.[3] As in Bajakajian, Ladum's potential penalties under the Sentencing Guidelines "confirm a minimum level of culpability." Id. at 2038.3. Harm Caused
 
 
 26
 In determining whether the forfeiture is grossly disproportionate given the gravity of the offense, the court should consider the extent of the harm caused. Id. at 2039. Here, neither creditors nor the government suffered any actual loss. In fact, the forfeiture judgment provides that, upon sale of the Property, Chemical Bank is to receive all principal and interest due on the loan first. The bank will be fully reimbursed before any amount is forfeited. In sum, applying the Bajakajian factors to this case leads to the conclusion that Ladum's violations were at the low end of the severity spectrum.
 
 
 27
 4. Gravity of the Offense v. Amount of the Forfeiture
 
 
 28
 In Bajakajian, the Court compared the gravity of the defendant's crime with the $357,144 forfeiture the government sought. The Court determined that the forfeiture was "larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government." Id. at 2039. Therefore, the forfeiture was held to be grossly disproportionate to the gravity of the offense. Id.
 
 
 29
 The same is true in this case. Since Ladum was not criminally prosecuted, no fine could be imposed. It appears, however, that the maximum fine she could have faced was $5,000. The $200,686 the government seeks to forfeit is more than 40 times the maximum fine permitted under the Guidelines. Further, this amount bears no reasonable correlation to any injury suffered by the government or any other party, as the fraudulently-obtained loan will be fully repaid. We hold, therefore, that forfeiture of the entire $200,686.18 of increase in equity in the Property is excessive under the Bajakajian test and, thus, violates the Excessive Fines Clause.
 
 
 30
 In declining to hold an evidentiary hearing "to determine whether the forfeiture is excessive under the Eighth Amendment," Thurman St. II, 946 F.Supp. at 846, the district court relied on the observation in United States v. Feldman, 853 F.2d 648, 663 (9th Cir.1988), that "[w]hen the district court orders that the defendant forfeit the profits gained from illegal activity, it is hard to imagine how such a forfeiture could constitute cruel and unusual punishment." Aside from the fact that this statement was made in response to the challenge under the Eighth Amendment's Cruel and Unusual Punishment Clause, rather than its Excessive Fines Clause, Feldman pre-dates Bajakajian and does not control the decision in this case.[4]
 
 
 31
 In light of the above analysis, we conclude that the district court erred in declining to consider the question of whether permitting forfeiture of the entire $200,686.18, in light of the facts in this case, would amount to an excessive fine under the Eighth Amendment.
 
 IV. CONCLUSION
 
 32
 The district did not err in concluding that there was probable cause to support the forfeiture, that the $200,686.18 was "proceeds" of Ladum's fraudulent loan applications, and that Ladum was not an "innocent owner." We affirm the district court in these respects. The district court, however, erred in concluding that the Excessive Fines Clause was not implicated by this forfeiture. Because we conclude that forfeiture of the entire $200,686.18 violates the Eighth Amendment's Excessive Fines Clause, we reverse the judgment of forfeiture and remand the case to the district court for further proceedings consistent with this opinion.[5] Each party shall bear its or her own costs on appeal.
 
 
 33
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 RYMER, Circuit Judge, dissenting:
 
 34
 I concur in all except Part III.C, but cannot agree that we should reverse as the majority does on the Excess Fines Clause.
 
 
 35
 As the majority (correctly) concludes, the $200,686 the district court ordered forfeited to the government are "proceeds" of the fraudulently obtained loan. Under United States v. Feldman, 853 F.2d 648 (9th Cir.1988), forfeiture of proceeds can basically never be excessive. As we put it in Feldman, "[w]hen the district court orders that the defendant forfeit the profits gained from illegal activity, it is hard to imagine how such a forfeiture could constitute cruel and unusual punishment." Id. at 663. Thus, we held, forfeiture of proceeds received from an insurance policy as a result of arson "was not excessive." Id. This makes total sense: how can forfeiture of proceeds of criminal activity ever be excessive?
 
 
 36
 Although Feldman involved cruel and unusual punishment under the Eighth Amendment, not the Excessive Fines Clause, the standard Feldman applied--that the "interest ordered forfeited is not so grossly disproportionate to the offense committed," id., is precisely the same as the Supreme Court adopted for purposes of the Excessive Fines Clause in United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Therefore, Feldman 's reasoning continues to apply and is neither undercut, nor controlled by Bajakajian, as the majority concludes.
 
 
 37
 Indeed, the type of forfeiture at issue here is quite different from the type of forfeiture at issue in Bajakajian. Bajakajian involved a criminal prosecution, not an in rem forfeiture. Bajakajian expressly recognized the two are distinct. Bajakajian, 118 S.Ct. at 2035. Further, the money at issue in Bajakajian was the proceeds of legal activity and was to be used to repay a lawful debt. Id. In this case, the proceeds came from bank, mail and wire fraud and were used to pay off old loans and taxes which kept the house from foreclosure. While the latter is not necessarily an unlawful purpose, the former certainly was illegal activity. Thus, unlike the claimant in Bajakajian who was in lawful possession of the property (cash) because the crime did not lie in the possession of or transportation of the money, but in the failure to disclose it to customs officials, the property Ladum retains cannot be lawfully possessed since it is the fruit of an unlawful transaction. To profit from the proceeds of criminal activity can not possibly be disproportionate to anything. Finally, the aspects of forfeiture in relation to the gravity of the defendant's offense that Bajakajian thought important are in many respects fact-specific. Therefore, even if I agreed that Bajakajian could be dispositive (which I do not), I would remand for the district court to take another look in light of what the Supreme Court said.
 
 
 38
 The parties have not had the opportunity to brief the effect, if any, of Bajakajian since it came down after the district court decision--and after submission of the appeal. Bajakajian is the first time the Supreme Court has spoken on the Excessive Fines Clause. I may have missed its impact, or the importance of what the record discloses, with respect to the district court's decision in this case. For this reason, I do not believe that we should opine about its effect without the parties' input.
 
 
 39
 I therefore dissent from Part III.C.
 
 
 
 [1]
 Ladum knew that someone other than Meegan had prepared her tax returns for the years 1990, 1991, and 1992
 
 
 [2]
 In concluding that the statute involved in Austin, 21 U.S.C. §§ 881(a)(4) and (a)(7), provided for punishment, one of the factors on which the Court relied was that the statute, like the statute here, "expressly provide[s] an 'innocent owner' defense." Austin, 509 U.S. at 619, 113 S.Ct. 2801 (citation omitted). Compare 21 U.S.C. § 881(a)(4)(C), with 18 U.S.C. § 981(a)(2)
 
 
 [3]
 Under U.S.S.G. § 2F1.1 (Nov.1993), the base offense level of 6, without any adjustment for the amount of the loss, appears to be the applicable offense level. See id. Application Note 7(b) ("In fraudulent loan application cases ... the loss is the actual loss to the victim...."). Assuming that Ladum's criminal history would place her in Category I, offense level 6 yields a sentencing range of 0-6 months. Id. Sentencing Table. Under U.S.S.G. § 5E1.2(c)(2) & (3), the permissible fine for offense level 6 is $500 to $5,000. U.S.S.G. § 5E1.2(c)(4), however, provides that in cases where, as here, the statute authorizes a maximum fine of more than $250,000, the limitation in subsection (c)(2) does not apply. The above is a rough approximation of the applicable Guideline sentencing level, even after taking into account the multiple count determination under U.S.S.G. §§ 3D1.1-3D1.3 (grouping of closely related counts)
 
 
 [4]
 The district court did not have the benefit of Bajakajian when it decided this issue
 
 
 [5]
 Ladum also contends that her Sixth Amendment right to a jury trial was violated. The Sixth Amendment, however, is not implicated in civil in rem forfeiture proceedings. See United States v. $292,888.04, 54 F.3d 564, 569 (9th Cir.1995). Moreover, the government concedes that Ladum is entitled to a jury trial on any disputed issue of material fact. Presumably, this would include any disputed factual issues material to the excessiveness inquiry. Cf. Bajakajian, 118 S.Ct. at 2037 n. 10 (noting that "factual findings made by the district courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous.")